## DONNER ET AL. *v.* CALVERT DISTILLERS CORPORATION

[No. 38, October Term, 1950.]

478

*Decided December 7, 1950.*

*Rehearing denied January 10, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*John G. Rouse, Jr.,* and *George W. Baker, Jr.,* with whom were *James C. Morton, Jr.,* and *Rouse & Morton* on the brief, for the appellants.

*Morris Rosenberg,* with whom was *William J. McWilliams* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

On December 11, 1947, the appellee filed its bill of complaint in the Circuit Court for Anne Arundel County against The Mills Cut Rate Liquor Mart, Inc. and Hillard Donner, asking for an injunction enjoining and restraining the defendants, their agents, servants and employees from advertising for sale, offering for sale, or selling distilled spirits and other alcoholic beverages known as "Calvert" or "Carstairs" products at prices lower than the prices heretofore or hereafter established by the complainant for such products, pursuant to agreements or contracts made by complainant with its retail dealers in the State, the schedule of minimum resale retail prices forming a part thereof. The bill also prayed that the complainant recover from the defendant all damages, costs and expenses suffered by them due to the unlawful acts of the defendants. These unlawful acts are recited as being the sale of a fifth gallon bottle of "Lord Calvert" whisky for less than the minimum price fixed by the Maryland Fair Trade Act, Chapter 239 of the Acts of 1937, codified as Sections 102 to 110 of Article 83 of the Code.

With the bill of complaint was filed as an exhibit, an agreement made by the appellee with James C. Corkran, a retailer in the State, which was stated to be one of

approximately 300 such contracts in force. There was also filed as an exhibit the appellee's list of minimum resale prices. At the top of this list is stated: "Bottle Cost To Consumer (Includes All Federal and State Taxes Except as Otherwise Noted)." "Calvert Reserve" is listed at $3.95 a fifth, and it is also stated on the list that the prices are in effect as of May 19, 1947, and will be effective until further notice. There is another notation that prices do not include the Baltimore City sales tax.

The defendants admitted the allegations of the bill and consented to the passage of a decree, and thereupon the decree of January 28, 1948 was filed. That decree permanently and perpetually enjoined and restrained the two defendants, "their agents, servants and employees, and all persons acting under their authority or control" from selling in the State, *inter alia*, Calvert distilled spirits sold under or bearing the trade marks of "Lord Calvert", "Calvert Reserve", etc., "at prices lower than the prices heretofore or hereafter established by the plaintiff for such products pursuant to the agreements or contracts made by the plaintiff with retail dealers in the State of Maryland under the authority of the Maryland Fair Trade Act of which the defendants shall have had due notice."

On January 3, 1949, the appellee filed in the case its petition alleging that the defendants had violated the decree by a sale of a pint bottle of "Calvert Reserve", on December 18, 1948, below the minimum resale retail price established. Defendants answered saying that they did not wilfully violate the order, and, after testimony, the corporate defendant was, on March 3, 1949, adjudged in contempt for violating the terms of the decree and directed to pay a fine of $250 and costs. On December 10, 1949, a second contempt petition was filed by the appellee. It showed that on May 1, 1949, the liquor license heretofore issued to Hillard Donner, trading as Mills Cut Rate, was re-issued to Hillard Donner and Joseph Donner. It also stated that in June, 1949, appellee revised its minimum resale retail prices, effective

July 1, 1949. In that revised price list, as shown by the schedule, "Calvert Reserve" was still listed at $3.95 a fifth, and the same notation about Federal and State taxes and the Baltimore City sales tax was contained in this schedule. It was alleged in the petition that, with full knowledge of these prices and of the injunction, the defendants and Joseph Donner on October 29, 1949, sold a fifth of "Calvert Reserve" for $3.95, whereas the minimum resale retail price was $3.95 plus 8c sales tax, and, on November 1, 1949, sold a fifth of "Calvert Reserve" for $3.75, and again on November 5, 1949, sold a fifth of "Calvert Reserve" for $3.95. The prayer of the petition was that the two original defendants and Joseph Donner show cause why they should not be punished for contempt, and an order to that effect was passed. The three parties named answered, the two original defendants together, and Joseph Donner separately, and testimony was taken before the court on March 3, 1950. On April 6, 1950, the court filed a memorandum and order finding that Hillard and Joseph Donner had notice of the decree, had notice of the minimum prices established by the plaintiff, and that they both sold liquor at prices less than the established minimum prices, and they were held in contempt of court. The corporate defendant was not held as it appeared that it was no longer conducting the business. Hillard Donner was fined $1,500 and Joseph Donner $500. From this order this appeal comes here.

The Maryland Fair Trade Act has been before this court in several cases, *Goldsmith v. Mead, Johnson & Co.*, 176 Md. 682, 7 A. 2d 176, 125 A. L. R. 1339; *Schill v. Remington Putnam Book Co.*, 179 Md. 83, 17 A. 2d 175, 22 A. 2d 128; *Schill v. Remington Putnam Book Co.*, 182 Md. 153, 31 A. 2d 467, 32 A. 2d 296; and *Hutzler Bros. Co. v. Remington Putnam Book Co.*, 186 Md. 210, 46 A. 2d 101, 163 A. L. R. 884. These cases had to do with the validity and construction of the act, and the questions involved were raised on injunction suits. The case before us is the first case in which we have had

before us an adjudication and fine for contempt for the violation of such an injunction.

Actions for contempt of court can be either civil or criminal, and the same act may be the subject of both kinds of proceedings. The distinction was made in the case of *Bessette v. W. B. Conkey Co.*, 194 U. S. 324, 24 S. Ct. 665, 48 L. Ed. 997, where the Supreme Court quoted a statement of Judge Sanborn in *Re Nevitt,* 8 Cir., 117 F. 448, 54 C. C. A. 622. This quotation was re-quoted by this court in the leading case of *Kelly v. Montebello Park Co.*, 141 Md. 194, 118 A. 600, 601, 28 A. L. R. 33, and is in part as follows: "Proceedings for contempts are of two classes, those prosecuted to preserve the power and vindicate the dignity of the courts and to punish for disobedience of their orders, and those instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled. The former are criminal and punitive in their nature, and the government, the courts and the people are interested in their prosecution. The latter are civil, remedial and coercive in their nature, and the parties chiefly in interest in their conduct and prosecution are the individuals whose private rights and remedies they were instituted to protect and enforce."

In the *Kelly case,* the question was whether an order imposing fines upon three people who had violated an injunction was appealable. At the time the case was decided, there was no statutory appeal in contempt cases such as is now provided. See *In re Lee,* 170 Md. 43, 46, 183 A. 560. Kelly and his wife had been preliminarily enjoined from erecting a garage. They disobeyed the order, and, with the third party fined, who was not a party to the original proceeding, but who had knowledge of the injunction, they constructed the garage. If the order holding them in contempt was civil in its nature, then it was interlocutory, and could only be considered on appeal from a final decree after the latter

had been entered. On the other hand, if the order was criminal, it constituted an independent and distinct proceeding, even though it was filed in the equity case, and there was no appeal provided in such a proceeding. The case was brought to prevent the garage from being erected within 75 feet from the front street line of a lot, but the court held that notwithstanding the interest of the Montebello Park Co. in the enforcement of the building line, the order passed was for a criminal contempt. It said that the offense consisted in the doing of an act forbidden by the writ, and the sentence was not remedial but distinctly punitive. It added that there was nothing in the contempt proceeding indicating that the parties treated it as a proceeding for civil contempt, there was no petition praying for remedial relief, the fines were not made payable to the parties injured, and the only purpose of the order imposing them was to vindicate the authority of the court. The court, in considering the case, discussed the leading case of *Gompers v. Bucks Stove & Range Co.,* 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, and quoted at length from Mr. Justice Lamar who delivered the opinion in that case. The quotation in part is as follows: "It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial, as well as punitive, and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is inflicted not as punishment, but is intended to be remedial by coercing the defendant

to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order."

In the *Gompers case,* the respondents were ordered imprisoned for a fixed period, and on appeal, the Court of Appeals of the District of Columbia affirmed, after holding that the proceeding was one for criminal contempt. The Supreme Court reversed, holding that the contempt proceedings were instituted and titled, tried, and, up to the moment of sentence, treated as part of the original case in equity, that the Bucks Stove and Range Co. was the actual and not the nominal party. These were not controlling facts, but were to be considered along with others, but the court held that the prayer of the petition was significant and determinative. That prayer was that the petitioner (that is, Bucks) might have such other and further relief as the nature of its case might require. The court held that was practically the equivalent of asking for a fine payable to itself, the case was one of civil contempt rather than criminal contempt, and the sentences were erroneously entered as if it were the latter type of proceeding.

It may be noted that in the case before us, the prayer in the petition contains no suggestion of relief to the complainant (appellee here), nor any suggestion that there should be any fine or other payment coming to it.

In a recent case, *United States v. United Mine Workers of America,* 330 U. S. 258, 67 S. Ct. 677, 695, 91 L. Ed. 884, the defendant, a body corporate, and John L. Lewis, its president, were restrained from encouraging mine workers to interfere with the operation of the bituminous coal mines by strike or cessation of work. At the time of this injunction, the United States was operating the mines. The injunction was temporary, pending the hearing, but before it was heard, the miners commenced to walk out and a full-blown strike was in progress. Thereupon, the United States filed a petition in the District Court for the District of Columbia, asking that the

United Mine Workers and Lewis be punished for contempt. One defense of Lewis and the union was that the Norris-LaGuardia Act, 29 U. S. C. A. § 101 et seq., prohibited the granting of the temporary injunction. This was overruled by the court, and, after a trial, the defendants were found guilty of both criminal and civil contempt. Lewis was fined $10,000 and the union $3,500,-000. When the case reached the Supreme Court, the majority of the court sustained the conviction and fine against Lewis, but reduced the fine against the union to $700,000 which was for criminal contempt, and made the other $2,800,000 a coercive fine for civil contempt by providing that it should be conditional on the union's failure to purge itself of contempt within a specified time. The court held that the Norris-LaGuardia Act did not prevent the granting of the preliminary injunction, but it also held that even had its conclusion on this point been the other way, the District Court had power to preserve existing conditions while it was determining its own authority to grant injunctive relief, and said: "The defendants in making their private determination of the law, acted at their peril. Their disobedience is punishable as criminal contempt." In discussing this subject, the court quoted at length from the opinion of Justice Holmes in *U. S. v. Shipp*, 203 U. S. 563, 27 S. Ct. 165, 51 L. Ed. 319, and mentioned a number of other Supreme Court cases, finally stating: "We insist upon the same duty of obedience where, as here, the subject matter of the suit, as well as the parties, was properly before the court; where the elements of federal jurisdiction were clearly shown; and where the authority of the court of first instance to issue an order ancillary to the main suit depended upon a statute, the scope and applicability of which were subject to substantial doubt." The court also clearly distinguished the difference between civil and criminal contempt, although it held that both might be included in the same case, and said: "It does not follow, of course, that simply because a defendant may be punished for criminal contempt for

disobedience of an order later set aside on appeal, that the plaintiff in the action may profit by way of a fine imposed in a simultaneous proceeding for civil contempt based upon a violation of the same order. The right to remedial relief falls with an injunction which events prove was erroneously issued, *Worden v. Searls, supra,* 121 U. S. [14] at pages 25, 26, 7 S. Ct. [814] at page 820, 30 L. Ed. 853; *Salvage Process Corp. v. Acme Tank Cleaning Process Corp.,* 2 Cir., 1936, 86 F. 2d [725] 727; *S. Anargyros v. Anargyros & Co., C. C.,* 1911, 191 F. 208; and *a fortiori* when the injunction or restraining order was beyond the jurisdiction of the court. Nor does the reason underlying *United States v. Shipp, supra,* compel a different result. If the Norris-LaGuardia Act were applicable in this case, the conviction for civil contempt would be reversed in its entirety."

In the case of *Cassidy v. Puett Electrical Starting Gate Corp.,* 182 F. 2d 604, decided by the U. S. Court of Appeals for the 4th Circuit, on May 25, 1950, it appeared that the Puett Corporation had brought an action against a Maryland corporation and the United Starting Gate Corporation, alleging that the gate for starting horses at races used by the defendants infringed complainant's patents for a similar gate. The District Court held the Puett patents valid and that one of them was infringed by the United Starting Gate Corporation, and enjoined the defendants and their officers from using this gate. Cassidy, who was president of United and was also acting under contract as a starter at Hialeah race track in Florida, resigned as president, but continued his activities as starter at Hialeah, and continued to use the United gate. A show cause order was issued, and, at a hearing before the District Court, United and Cassidy were held guilty of contempt for violating the terms of the injunction, and were each fined. They appealed this contempt order. An appeal was also taken from the injunction. In the injunction case, the Circuit Court of Appeals held that the patent which the District Court had found infringed the Puett patent, did not infringe it in fact, and

it therefore reversed the District Court. *Harford, etc. Ass'n v. Puett, etc. Corp.,* 4 Cir., 182 F. 2d 608. In the contempt case, however, the court said: "We are this day handing down an opinion in the patent case * * *, out of which the contempt proceeding arose. In that opinion we are reversing the holding of the District Court that the United gate infringed the Whann patent. This, however, in no wise affects the judgment of the District Court that Cassidy and United were guilty of contempt. At the time of the contemptuous acts, the injunction decree was in full force." [182 F. 2d 608.]

We have discussed the underlying bases for civil and criminal contempts and have cited the foregoing cases because the principal contention made by the appellants here is that in their trial there was no proof that there existed at that time an agreement or contract made by the appellee with retail dealers in the State under the authority of the Fair Trade Act of which they, the defendants, had due notice. They say that there was a failure of proof in this regard, and therefore their conviction should be set aside.

The proceeding before us was one for criminal contempt. It was clearly not remedial, nothing was asked by way of recompense to the appellee, and the court did not attempt to give them any recompense by way of fine or payment. The appellee brought the matter to the attention of the court, but it did so for the purpose of vindicating the previous injunction, and the mere fact that the petition was filed in the same proceeding as the injunction *does not, as we have shown, determine its* character. That was determined by what was asked, and, in this case, by what was done.

In the case of *Gompers v. Bucks Stove & Range Co., supra,* the Supreme Court said: "* * * it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself." (See also Note, 49 A. L. R. 975.) That does not mean, however, that in such a case,

the proof must go beyond what is necessary to prove the contempt, which is that the defendant disobeyed an order of the court. That order may be based upon erroneous facts as found in the Cassidy case, *supra,* or an erroneous conception of the law, such as was claimed in the *United Mine Workers case, supra.* Nevertheless, it must be obeyed until such time as it is stricken out on application, or reversed on appeal, or otherwise ceases to be a vital and subsisting direction of a court with proper jurisdiction over the parties to the case.

The appellants, however, say that the decree which they disobeyed in this case was passed on January 28, 1948, and their violations were in October and November, 1949; that the decree was based upon proof of the Corkran contract which was made March 13, 1947 for a period of one year (renewable, however, from year to year, unless the parties indicate in writing their desire not to have it renewed), and the appellee had the right to cancel this contract on 24-hour notice. Under these circumstances, they contend that before they could be held liable in a semi-criminal proceeding, it was obligatory to establish that a contract actually existed in October and November, 1949, when the alleged violations occurred. The appellee says in reply that there was sufficient evidence offered that the appellee was operating under the Fair Trade Act at the time of these violations, and they cite the following facts of which they state the proof was uncontradicted. On January 3, 1949, the appellant, Hillard Donner, and the Mills Cut Rate were cited for contempt, and on March 3, 1949, the corporation was adjudged guilty of contempt and fined $250; on June 17, 1949, there was mailed to the trade, including the appellants, a new price list effective July 1, 1949, with a letter from the president of the appellee, and a restatement of the appellee's Fair Trade policy in which was stated that it was the appellee's intention to continue its Fair Trade contracts in force and to enforce its minimum prices, and the proof in the case showed that the price in October and November was

the same as that listed at the time of the Corkran contract.

There is, within certain limits, a presumption of fact that something which has been proved to exist continues to exist for a reasonable time, depending on what it is and the circumstances of the case. This is known as the presumption of continuance, and it is held to be not a legal presumption, but a matter of the burden of proof. In other words, from the circumstances and facts of each particular case are to be determined whether a necessary fact, once proved, has to be shown by the prosecution to continue to exist, or whether there is a presumption of such continuance, and the burden shifts to the defendant to prove that it no longer exists. Wharton's Criminal Evidence, Vol. I, Paragraph 142. In the case before us, and under the circumstances, it may well be inferred that the Corkran contract, or any other of the approximately 300 contracts which appellee alleged it had in its petition for the original injunction, continued in force, or that new Fair Trade contracts were in force a year and nine or ten months later, especially since the corporation of the appellants had been fined seven or eight months before, for violating the decree, and it made no such suggestion then.

Appellants also contend that there was no proof that at or before the time of the alleged violations they had due notice of any prices established, largely because the violations in the original petition were sales of "Lord Calvert" whisky and not of "Calvert Reserve". We find no merit in this contention. They also contend there was no proof that the appellants knowingly or wilfully sold "Calvert Reserve", and they state, among other things, that the resale price was not shown to be $3.95 plus sales tax, but might be construed under the prices listed as $3.95, including sales tax. There is, however, one sale at $3.75 made by Hillard Donner.

Another contention upon which the appellants lay considerable stress is that the court erred in excluding certain testimony which was offered by them with re-

spect to sales below the Fair Trade price made by other dealers. The witness Ciccarone, a liquor retail dealer in the City of Annapolis, was asked: "Have you sold any Calvert products at less than the price established by the distillers?" He was not allowed to answer this question. Then he was asked: "Would you deny that on February 26, 1950, you sold a fifth of Calvert Reserve whisky for less than the Fair Trade price?" He was not permitted to answer this question, and then the proffer was made that had he been allowed to answer the question, he would have admitted that he did make such a sale on such a date. The appellants further made a proffer in the following words: "We have issued subpoenas for a number of retail liquor dealers in the city of Annapolis who are here in court. We would like to make this proffer that were these witnesses placed on the stand and permitted to answer the question, they would admit that at one time or another, they have sold a fifth of Calvert Reserve at less than the Fair Trade price." This proffer was objected to and the objection sustained. Thereafter, Mr. Theodore Kates, State manager for Maryland of the Calvert Distilling Corporation, was asked whether he observed in the window of Chick's Liquor Store on Main Street a display of "Calvert" with a sign saying: "Selling Calvert Reserve for $3.49". He was not allowed to answer this or another similar question, or a question whether he had received complaints that Chick's Liquor Store was advertising "Calvert Reserve" at less than the Fair Trade price. Appellants then proffered that if the witness were allowed to testify, his answer would be that there was a display of "Calvert Reserve" whisky, that it was displayed and advertised in the window of Chick's Liquor Store for the price of $3.49 during the spring or early summer of 1949. This proffer was objected to and the objection sustained.

In the case of *Hutzler Bros. v. Remington Putnam, supra,* we said that the Act requires by implication that the prices fixed in a Fair Trade contract shall be uniform in any competitive area, and that in the performance of

the agreement, the producer must refrain from causing any unjust discrimination among the retail dealers. He is required to use reasonable diligence to see that his products are not sold to a retailer who cuts prices after the producer has notice of such violation, and where price cutting has been general and long continued, the failure of a producer to take effective measures to prevent such violation should be regarded as a waiver or abandonment of the rights conferred by the contract. We also said that the right of a producer to an injunction against a violator is not defeated by the fact that there may be some violators who have not been sued. There is no mandatory provision in the Fair Trade Act requiring a producer to take legal action, and it would be impossible to enforce one's rights under a Fair Trade agreement, if as a prerequisite to relief, it were necessary to institute suit to enjoin all violators simultaneously.

It is obvious that the proffered testimony, if admitted, would not be sufficient to put the appellee in such a situation that the court could say that it had waived or abandoned its rights under the contract. If another retail dealer sold for less than the contract price, or even if the appellee knew that one sold at less than the contract price, that would not bar relief against the appellants. The proffer as to an unspecified number of liquor dealers in Annapolis who were in court did not show that they would state the time at which they had sold the "Calvert Reserve" at less than the Fair Trade price, whether before or after the injunction. It did not purport to prove any knowledge on the part of the appellee that this had occurred at any time, nor did it show whether or not any of those liquor dealers had been enjoined or were defendants in injunction cases brought by the appellee. Further, it did not show the number of those who would so testify, nor what proportion of the total liquor dealers in the city of Annapolis were prepared to admit their violations. These reasons why the testimony was properly refused go to the heart of the question. The appellee cannot be held to have waived or to have aban-

doned its rights unless, at the least, it is shown that it knew of substantial violations and made no effort to prevent them. The proffered evidence, if admitted, would not have proved any such situation.

Further objection is made that the fines were excessive. It appears that after the court heard the case, it asked for information from the State Comptroller on the size of the business operation of the appellants. In response to this request, the Comptroller's office advised the court that all retail licensees are required to file with that office reports showing their purchases of all distilled spirits. The letter from the Comptroller's office listed by location, but not by name, the ten greatest purchasers who reported during the last six months of the calendar year 1949. The appellants purchased 10,929.72 gallons, which was the largest amount of any of such purchases. The next retailer purchased 7,000-odd gallons, and the tenth in size purchased a little over 5,000 gallons. This would indicate that the appellants were among the largest, if not the largest, retail liquor dealers in the State of Maryland, and, under such circumstances, the fine would not seem to be excessive. The court, in determining the sentence in a criminal case, may examine pertinent official records. *Murphy v. State,* 184 Md. 70, 40 A. 2d 239.

We think, however, that the price lists furnished by the appellee may unwittingly have lent themselves to the construction that the Fair Trade price included the State sales tax. Under these circumstances, since Joseph Donner sold only at the price listed including the tax, and since this is a semi-criminal proceeding, we are unwilling to hold him guilty. The order, therefore, as to Joseph Donner will be reversed.

*Order affirmed as to Hillard Donner, with costs. Order reversed as to Joseph Donner, with costs.*