SWED DISTRIBUTING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58892.   Filed October 17, 1958.

---

[6] See footnote 1 ; sec. 117 (a) (3), I. R. C. 1939.

*Arthur Glover, Esq.*, for the petitioner.
*John P. Higgins, Esq.*, for the respondent.

FORRESTER, *Judge:* The Commissioner determined deficiencies in income tax and excess profits tax for the years and in the amounts as follows:

| Year ended July 31 | Tax | Deficiency |
|---|---|---|
| 1951 | Income and excess profits | $7,337.37 |
| 1952 | Income and excess profits | 8,340.12 |
| 1953 | Income and excess profits | 24,619.78 |

The sole question is whether petitioner is entitled to deduct as ordinary and necessary business expenses the amounts of $15,075.40, $16,038.69, and $19,497.72, paid by it to Swed and Sullivan, a partnership composed of petitioner's principal stockholders.

### FINDINGS OF FACT.

The petitioner, Swed Distributing Company, is a corporation doing business in the State of Florida and with its principal place of business in Tampa, Florida. It filed its income and excess profits tax returns for the fiscal years ending July 31, 1951, and July 31, 1952, with the then collector of internal revenue for the district of Florida, and its income and excess profits tax return for the fiscal year ended July 31, 1953, with the director of internal revenue for the district of Florida.

Petitioner's principal stockholders during the years in question were Louis Swed (hereinafter referred to as Swed) and John L. Sullivan (hereinafter referred to as Sullivan). Swed, the active participant, and Sullivan, a Texas oilman, had engaged in the business of operating a beer distributorship in the State of Texas. Through a man named George O. Hinzpeter (hereinafter referred to as Hinzpeter) they were able to acquire distributorships for Budweiser beer in the State of Florida.

On December 30, 1944, Swed and Sullivan entered into a partnership agreement for the purpose of conducting and operating this distributorship in the State of Florida under the firm name, Swed Distributing Company. It was provided in their agreement that Swed should manage the business and receive a salary. The remaining profits were to be divided equally between the partners.

On June 1, 1945, a new partnership agreement was executed wherein Hinzpeter became a partner in the business. Under the new agreement Hinzpeter was to receive 35 per cent of the net profits of the business and Swed and Sullivan were each to receive 32½ per cent of the net profits of the business. It was specifically provided that Hinzpeter was under no obligation to contribute capital to the part-

nership but was to devote his time and services to the partnership. This agreement was made retroactive to February 1, 1945.

Prior to April 30, 1945, Hinzpeter had been an employee of Anheuser-Busch, Inc., of St. Louis, Missouri, the brewers of Budweiser beer, and had at one time been in charge of all of Anheuser-Busch's distributors in the south. At the time he was granted a partnership interest in the Swed distributorship, beer was in short supply. Because of his prior connections with Anheuser-Busch, Inc., Hinzpeter was able to obtain additional beer for the Swed Distributing Company.

On October 1, 1945, Swed, Sullivan, and Hinzpeter entered into a new agreement wherein their partnership was dissolved "as of the date of its purported inception," and in its place the partnership of December 30, 1944, between Swed and Sullivan was reinstated. As a part of the consideration for the agreement Hinzpeter received a contract of employment from the reinstated partnership.

This contract of employment, dated October 1, 1945, provided that Hinzpeter was to be employed by the Swed Distributing Company (partnership) in the capacity of supervisor of sales and public relations and as a consultant. Pursuant to the contract it was provided that Hinzpeter was to receive a salary of $1,000 per month, and in addition thereto was to receive a bonus or commission of 15 per cent of the net profits of the business of the partnership. The employment contract also provided that if Hinzpeter should not devote his entire time to the business of the partnership his salary should be reduced but that his interest in the net profits of the business would continue so long as he should render services of a consultatory nature.

As time went on, Swed became dissatisfied with Hinzpeter as an active employee of the business. He felt that Hinzpeter, although being acquainted with the problems of dealing with distributors, did not understand the problems of operating a distributorship and the problems involved in dealing with retail outlets. This was of some worry and concern to Swed.

On July 30, 1946, the accountant for the Swed Distributing Company wrote a letter to Sullivan recommending that steps be taken by the partners to disassociate themselves from Hinzpeter. It was suggested by the accountant that the partners might give Hinzpeter the Jackonsville, Florida, outlet, which it was estimated was then producing about $50,000 per year in net income, in return for which Hinzpeter would agree to terminate the employment contract.

In August of 1946 petitioner was organized to take over and carry on in corporate form the business of the partnership. Among the assets and liabilities transferred to it by the partnership was Hinzpeter's contract of employment.

Soon thereafter, on October 1, 1946, an agreement was entered into between Hinzpeter and petitioner wherein the October 1, 1945, employment contract between Hinzpeter and the Swed Distributing Company (partnership) was canceled and terminated. In consideration of the cancellation of the employment contract petitioner agreed to pay Hinzpeter 15 per cent of its net profits after taxes. The pertinent provisions of the contract are:

WHEREAS, party of the second part [Hinzpeter] contemplates withdrawal from active and continued participation in the business conducted by party of the first part [petitioner], and the parties hereto [Hinzpeter and petitioner] have agreed to terminate the aforesaid Contract of Employment dated October 1, 1945, and

WHEREAS, it is recognized that [Hinzpeter], through his efforts and counsel, has contributed to the establishment and success of the business of [petitioner], which contributions form the basis of a part of the consideration for this agreement, and

\*      \*      \*      \*      \*      \*      \*

Now, THEREFORE, in consideration of the premises, and in consideration of the cancellation and termination of the aforesaid Contract of Employment dated October 1, 1945, and pursuant to a resolution of the Board of Directors of [petitioner], it is agreed as follows:

(1) That the Contract of Employment \* \* \* dated October 1, 1945, be and the same is hereby canceled and terminated, and all rights and obligations of the parties thereunder shall cease and determine.

(2) That subject only to the conditions hereinafter stated, [petitioner] agrees to pay unto [Hinzpeter] a sum equal to fifteen percent (15%) of the net profits (after taxes) of [petitioner], payable annually within 60 days of the close of the fiscal year of [petitioner].

It is expressly understood and agreed between [petitioner and Hinzpeter] that payment of the proportion of net profits hereinabove provided shall continue only during the lifetime of [Hinzpeter], and shall terminate at any time [petitioner] should be deprived for any cause of the privilege of distributing Budweiser beer in any of its branches now established in the State of Florida, it being the intent hereof that this contract shall remain in force during the lifetime of [Hinzpeter], provided [petitioner] retains the right of distribution of Budweiser beer in all of its branches operated in the State of Florida.

Prior to and on October 1, 1946, petitioner had about six distributorships and 7,000 outlets in the State of Florida.

Prior to this cancellation of the employment contract of October 1, 1945, Swed had complained to the sales manager and vice president of Anheuser-Busch, Inc., J. J. Carroll (hereinafter referred to as Carroll), that Hinzpeter was going to get them into trouble in their Jacksonville, Florida, branch and requested that Anheuser-Busch, Inc., take him back to St. Louis. On October 1, 1946, Hinzpeter went back to work for Anheuser-Busch, Inc., in St. Louis, and remained in their employ until February 2, 1950.

Anheuser-Busch, Inc., had at all times a company policy against its employees having employment contracts with its distributors. According to Anheuser-Busch's sales service manager,

Such a policy always existed, based on good business practice as well as on the prohibition of many states, which in turn makes the Federal Regulations applicable also, that no employee of a firm licensed to manufacture alcoholic beverages may have a financial interest in any other type of licensee dealing in intoxicating liquor or non-intoxicating beer.

Swed had been communicating with Carroll asking him "to do everything possible to get Mr. Hinzpeter some kind of a settlement so we can pay him off and get out for the Swed Distributing Company." Presumably as a result, and in November 1947, Swed received a telephone call from Carroll and in response to this telephone call, made arrangements to go to St. Louis. Before departing he cashed a check in the amount of $25,000. This check was drawn on the checking account of "Swed & Sullivan," the partnership composed of Swed and Sullivan. The cost of Swed's transportation to St. Louis, Missouri, was billed to and paid by petitioner.

Upon arriving in St. Louis, Swed telephoned Carroll and asked him to come to his hotel room. Because of its importance to petitioner's contention that the contract of October 1, 1946, was assigned to the partnership, Swed and Sullivan, we now quote Swed's testimony verbatim:

Q. Did Mr. Karroll [sic] come to your room?
A. Yes.
Q. Then what happened?
A. I handed him the $25,000 and asked him to settle that matter with George Hinzpeter because he was an employee of the Anheuser-Busch.
Q. At that time?
A. Yes.
Q. All right, and then what happened?
A. Mr. Karroll [sic] left the hotel and came back with all the original contracts that I had with Hinzpeter.
Q. Mr. Swed, I hand to you the original of the contract dated October 1, 1946, and ask you if that is the contract which Mr. Karroll [sic] brought to you?
A. Yes, sir.

There is no further evidence in the record concerning this transaction.

Petitioner has made the following payments claimed to be in respect of the agreement of October 1, 1946, which agreement has not been endorsed in any manner:

| Fiscal year ending July 31 | Amount | Paid to |
| --- | --- | --- |
| 1947 | $20, 852. 72 | Hinzpeter |
| 1948 | 18, 378. 65 | Swed and Sullivan |
| 1949 | 17, 001. 35 | Swed and Sullivan |
| 1950 | 15, 089. 27 | Swed and Sullivan |
| 1951 | 15, 075. 40 | Swed and Sullivan |
| 1952 | 16, 038. 69 | Swed and Sullivan |
| 1953 | 19, 497. 72 | Swed and Sullivan |

The above payments to Swed and Sullivan for the fiscal years ending July 31, 1951, 1952, and 1953, were not ordinary and necessary

business expenses of petitioner within the intendment of section 23 (a) (1) (A) of the Internal Revenue Code of 1939.[1]

OPINION.

Whether a particular expenditure constitutes an "ordinary and necessary" business expense within the meaning of section 23 (a) of the Internal Revenue Code of 1939 is generally a question to be resolved in the light of circumstances surrounding the particular taxpayer and the particular expenditure. Cf. *Commissioner* v. *Heininger*, 320 U. S. 467. An expense will usually be considered "necessary" if it is appropriate and helpful in developing and maintaining the taxpayer's business. *Welch* v. *Helvering*, 290 U. S. 111.

In the instant case, petitioner offered in evidence a contract between itself and Hinzpeter wherein it agreed to pay Hinzpeter 15 per cent of the net profits of its business subject to two conditions.

We believe that this contract constituted a valid and legal obligation on the part of petitioner at the time it was entered into. We also believe that the consideration for petitioner's obligation was the termination of a burdensome employment contract, which admittedly is a normal business expense. *Bagley & Sewall Co.*, 20 T. C. 983, affd. 221 F. 2d 944. However, it is absolutely essential to petitioner's case that an assignment of the October 1, 1946, contract from Hinzpeter to Swed and Sullivan be established. Petitioner's case is based solely upon the theory of such an assignment or transfer and, as to this, petitioner has the burden of proof.

If petitioner had produced convincing evidence of an assignment, at least in form and by intendment of the actors (assignee and assignor), we would reach the further, troublesome question of whether this particular contract was assignable or whether it in fact required some continuing personal service from Hinzpeter designed to assist it in retaining "the right of distribution of Budweiser beer in all of its branches operated in the State of Florida."

In our view that question is not reached. The evidence relied upon by petitioner to prove assignment is not only scanty but tends to show that the primary, moving purpose of Mr. Swed and Mr. Sullivan in the November 1947 dealings was to rid petitioner completely of Hinzpeter and its obligations to him. Mr. Swed, communicating with Mr. Carroll just before the November 1947 meeting in St. Louis, asked him "to do everything possible to get Mr. Hinzpeter some kind of a settlement so we can pay him off and get out for the Swed Distributing

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—.

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

Company [petitioner]." The expenses of Swed's trip to St. Louis were paid by petitioner. Swed's detail of his dealings with Carroll in the hotel room in St. Louis adds nothing. It can be condensed to: "I handed him the $25,000 and asked him to settle that matter with George Hinzpeter * * * [he] left * * * and [then] came back with all the original contracts."

If anything, the above shows cancellation, not assignment.

It is true that the $25,000 paid was partnership money; however, we are not unmindful of the fact that Swed and Sullivan, the partners, were also Swed and Sullivan, the principal stockholders [2] of petitioner, and presumably in a position to control such matters.

There being no further evidence on this vital question of assignment, we conclude that petitioner's burden has not been met and therefore that the questioned payments were not required under the October 1, 1946, contract or "ordinary and necessary" expenses of petitioner.

We note that even if our views as to assignment were otherwise that neither of the contract's conditions has been proved, namely, (1) that petitioner's obligation should continue only during the lifetime of Hinzpeter, and (2) that petitioner's obligation should terminate if at any time it should be deprived for any cause of the privilege of distributing Budweiser beer in any of its branches then established in the State of Florida.

The only evidence adduced at the hearing and alluded to by petitioner in regard to the first condition is a letter dated September 30, 1957, from Jack Schuler, sales service manager, Brewery Division, Anheuser-Busch, Inc., to J. Marvin Kelley, respondent's regional counsel, wherein, in response to the question, "4. What is the last known address of George O. Hinzpeter?," Schuler replied, "4. Kennerly Road, Sappington, St. Louis County, Missouri."

Petitioner relies on this answer as direct evidence that Hinzpeter was still alive during the years now in issue. Such reliance is unfounded for the same letter shows that Hinzpeter had not been employed by Anheuser-Busch since February 2, 1950, and the record is silent as to his age and health.

As to the second condition, petitioner has utterly failed to enlighten us. We know that petitioner had had six distributorships with 7,000 outlets in the State of Florida. We assume that the distributorships are the "branches" referred to in the contract of October 1, 1946, but apart from knowing that Hinzpeter had been instrumental in securing for these branches the privilege of distributing Budweiser beer, we are left in the dark. Concerning such "privilege," we do not know

---

[2] The record shows that Swed owned 50 per cent of petitioner's stock. It is unclear as to the exact percentage owned by Sullivan, but indicates, and petitioner concedes, that Sullivan was a substantial ("the other") stockholder.

whether it was single or several, oral or written, for a definite term or at sufferance.

Concerning presumptions of continuance, it has been held that:

something which has been proved to exist continues to exist for a reasonable time, *depending on what it is and the circumstances of the case.* This is known as the presumption of continuance, * * * [Emphasis supplied.]

*Donner* v. *Calvert Distillers Corp.*, 196 Md. 475, 77 A. 2d 305 (1950). Also,

We assume that plaintiff intended to rely upon the rule that where the existence of a certain condition or state of affairs *of a continuous nature* is shown, the general presumption arises that such condition or state continues to exist, * * * so long as is usual with conditions or things of *that particular nature.* * * * [Emphasis supplied.]

*Kelly* v. *Laclede Real Estate & Investment Co.*, 348 Mo. 407, 155 S. W. 2d 90 (1941). And,

"Proof of the existence at a particular time of a fact *of a continuous nature* gives rise to an inference within logical limits, that it exists at a subsequent time." * * * [Emphasis supplied.]

*Dunbar* v. *Commissioner*, 119 F. 2d 367 (C. A. 7, 1941).

Since we know nothing of the particular nature of the privilege here involved, we would conclude that petitioner had not shown us enough to warrant a presumption on our part that it has continued at all of the branches in Florida which petitioner had on October 1, 1946.

Reviewed by the Court.

*Decision will be entered for the respondent.*