TULLY, ET AL. *v.* DASHER, ET AL.

[No. 257, September Term, 1967.]

*Decided July 2, 1968.*

The cause was argued before HAMMOND, C. J., and HOR- ██*, MARBURY, BARNES, McWILLIAMS, FINAN and SING- LEY, JJ.

*Hugh L. Reilly* and *Arthur V. Butler,* with whom were *Butler & Gorman, Edward J. Gorman, Jr.,* and *James R. Reynolds* on the brief, for appellants.

*Arthur D. Leach,* with whom were *Sorrell & Paulson, Richard S. Paulson* and *W. Byron Sorrell* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The appellant, United Investment Management Corporation (United), is the rental agent for the Pennbrooke Apartments located in Suitland, Prince George's County. It signs the leases with the tenants as landlord. Mrs. Ruby L. Tully, the other appellant, is employed by United as resident manager of Pennbrooke Apartments and had been so employed since November 7, 1964.

The appellees, Mrs. Laverne Dasher and Mrs. Dona Mae Talbott, were tenants in two separate apartments in the Pennbrooke Apartments on Saturday, January 16, 1965, having possession of their respective apartments under similar leases which had been automatically converted into month to month tenancies after their respective one-year terms had expired. Mrs. Dasher, her husband Charles Dasher, and their daughter Sherry, then aged fifteen, occupied apartment T-2 in 5088 Silver Hill Court and Mrs. Talbott, also a daughter of Mr. and Mrs. Dasher, occupied apartment T-1 in 5044 Silver Hill Court with her husband Pearson Talbott, and her two girls, one three years of age and the other eight years of age.

The appellees, Mrs. Dasher and Mrs. Talbott, were plaintiffs below in an action against United and Mrs. Tully to recover damages resulting to the plaintiffs from malicious prosecution. The case was tried by a jury and resulted in verdicts of $15,000 in favor of Mrs. Dasher and $10,000 in favor of Mrs. Talbott, respectively. This appeal was timely taken from a judgment entered upon those verdicts.

United and Mrs. Tully, the appellants, raise several questions before us. These questions involve alleged errors of the lower court in refusing to grant motions of the defendants for di-

rected verdicts, the alleged improper argument to the jury by counsel for the plaintiffs and the alleged errors of the trial court in ruling on evidence in five regards. We will first consider the facts generally and then other facts under the discussion of each of the alleged errors.

On Saturday, January 16, 1965, Mrs. Dasher and Mrs. Talbott sponsored a birthday party for Sherry Dasher and her teenage friends at the Dasher apartment, T-2, and also utilized the adjacent laundry room, 669 square feet in size (35 feet long with a varying width from 17 to 23 feet), for the party. Mrs. Dasher had obtained permission for a similar party, utilizing the laundry room, the previous year from Mrs. Beverly J. Henkle, the predecessor as resident manager of the apartment house of Mrs. Tully, so that she did not apply to the management for additional permission for the party to be given on January 16, 1965. The birthday party began at approximately 7:00 p.m. on January 16 with approximately twelve persons attending, of whom eight or more were teenagers, the others being adults chaperoning the party. It was a cold day and was snowing so that several of the guests, who had been invited for 5:00 p.m., were late in arriving at the party. A small portable record player was used, playing rock and roll music, at a moderate sound level.

One of the tenants at the Pennbrooke Apartments (not produced at the trial as a witness) apparently complained about the party. The complaint ultimately reached Mrs. Tully who requested Nicholas Uhal, a maintenance engineer for the Pennbrooke Apartments, to investigate the party going on in the Dasher apartment and adjacent laundry room. When Mr. Uhal came to the laundry room, he requested that the music be turned down and suggested that the party be moved into the Dasher apartment. The music was turned down and the guests began to move the party into the Dasher apartment. Mr. Uhal then returned to Mrs. Tully's apartment—approximately one block from the laundry room—and reported to her that a party was in progress. Mrs. Tully then called the Prince George's County Police and the two police officers who responded to her call accompanied Mrs. Tully and Mr. Uhal to the laundry room. When they arrived, no music was playing and the room was

empty. Mrs. Tully thought the party had ended. After some of the guests, Mrs. Dasher and Mrs. Talbott had entered the laundry room, Mrs. Tully, without identifying herself, demanded in a loud voice that they "get the hell out" of the laundry room and stop the party. Thereafter there was a vigorous exchange of strongly worded statements between Mrs. Tully and Mrs. Dasher. Mrs. Dasher attempted to explain that she had received permission from Mrs. Henkle, the resident manager, to hold a birthday party in the laundry room and was not aware that Mrs. Tully had replaced Mrs. Henkle as the resident manager. Mrs. Dasher testified that Mrs. Tully stated, during the course of the exchange, that she was going to have Mrs. Dasher arrested. The testimony then was as follows: " 'I asked her what for * * * I didn't do anything wrong.' And she said, 'Well, I am going to have you arrested anyhow.' And I said 'Well you can't.' She said 'United Investors told me I could.' "

The police officers requested Mrs. Dasher to take the party into her apartment. When Mrs. Tully, Mr. Uhal and the two officers left, the transfer of the party to the Dasher apartment was completed.

Officer Blankford, one of the two police officers who testified for the defendants, testified that no one was disorderly in his presence and that he had informed Mrs. Tully that if the party was continued, was loud and disturbed anyone, "then she could contact the Justice of the Peace to secure a warrant for disorderly conduct by disturbing the peace, but they weren't disorderly in my presence." Shortly thereafter, Mrs. Tully telephoned Janet Kurland, the secretary-treasurer of United, who authorized her to swear out warrants for Mrs. Dasher and Mrs. Talbott. Without further communication with either Mrs. Dasher or Mrs. Talbott and without checking to see if the party had been discontinued in the laundry room, Mrs. Tully drove six miles (a round trip of twelve miles) to the Suitland Police Station through the heavy snow and swore out warrants for Mrs. Dasher and Mrs. Talbott before a Justice of the Peace, charging them with disorderly conduct. These warrants were forwarded to the police to be served and were in fact served at 1:30 a.m. Sunday morning January 17, 1965. Following

service, Mrs. Dasher and Mrs. Talbott dressed, were taken into custody, placed in the police wagon with neighboring tenants watching, and taken to the police station where they were booked for disorderly conduct, posted bond and were released.

When the two criminal cases came before the People's Court for Prince George's County on March 15, 1965, both defendants were found not guilty.

On January 26, 1965, ten days after the birthday party, Mrs. Tully personally handed Mrs. Dasher an eviction notice charging her with disorderly conduct and ordering her to vacate the Dasher apartment. The Dashers did this and Mrs. Talbott and her family moved from their apartment because of their fear of what Mrs. Tully and United might do to them if they remained as tenants with Mrs. Tully as resident manager.

Mrs. Dasher and Mrs. Talbott employed counsel to defend them against the criminal charges at a cost of $200. Mrs. Dasher lost one week's work because of her upset condition following her arrest and both plaintiffs had to incur moving expenses and pay $8.50 each as a bond premium in connection with the criminal charges. Mrs. Dasher suffered stomach irregularities resulting from the tension caused by her arrest and removal from her home in the middle of the night and Mrs. Talbott experienced tension headaches. Neither Mrs. Dasher nor Mrs. Talbott had ever had any criminal charges placed against them and both suffered great embarrassment because of the permanent record of the criminal charges placed against them as a result of the warrants having been sworn out against them.

On cross-examination, when examined in regard to the alleged disorderly conduct, Mrs. Tully testified as follows:

> "Q. In what way would you say that Mrs. Talbott and Mrs. Dasher were disorderly, taking them one at a time?
>
> * * *
>
> "Q. Mrs. Talbott first, please. A. Mrs. Talbott was siding in with her mother and agreeing with her, that they started bringing up things that had happened that was not material to what was going on in the basement

there, and well, I felt that she—it was no concern of hers, that she did not live there, and I felt that she had no say so of what I was trying to restore peace and quietness in the building, and the intimating remarks, I was nobody, not mess with her, she is nobody, you don't have to listen to her, and things of this nature.

"Q. Did Mrs. Talbott tell you you were a nothing? A. She—she said I was nothing, I was new.

"Q. Mrs. Talbott? A. Yes.

"Q. Is this the reason you swore out the warrants? A. That is right.

"Q. You felt that they did not show proper respect for your authority and position? A. I felt they didn't show me respect, regardless of my authority or position.

"Q. And that is the reason that you felt they were disorderly? A. They were disorderly in refusing to remove the equipment from the laundry room, telling me I couldn't make them move it from there.

"Q. But the main reason was this disrespect? A. Not disrespect. I didn't appreciate being called a nothing—."

We will now consider the alleged five errors of the trial court on the admission of certain evidence.

## 1.

The first claim of error of the trial court in ruling on the evidence was permitting Mrs. Henkle, a witness for the plaintiffs, to testify over objection of the defendants (a) in regard to the lease of the Dashers with United, (b) the policy of United toward tenants in regard to parties, and (c) that the witness granted the Dashers permission to hold a party one year prior to January 16, 1965.

## (a)

In regard to the Dasher lease, the record does not indicate that Mrs. Henkle testified in regard to the Dasher lease on

direct examination. Counsel for Mrs. Dasher asked Mrs. Henkle:

"Q. Mrs. Henkle, is it permissible under the lease of the building in which you were resident manager for the tenants to hold parties?

"Mr. Butler (counsel for the defendants): Objection on the best evidence rule, as the lease speaks for itself, Your Honor.

"The Court: Rephrase your question, counselor.

"By Mr. Leach (counsel for the plaintiffs): Q. Mrs. Henkle, while you were resident manager did you make any rules respecting parties being held by the tenants of the apartment buildings?"

This last question was objected to and counsel for the plaintiffs then ultimately went to the question of the specific authorization by Mrs. Henkle to hold a birthday party for her daughter.

The questions in regard to the lease were propounded to Mrs. Henkle on *cross-examination by counsel for the defendants.* There obviously can be no error on this ground available to the defendants, now appellants here.

## (b) and (c)

The testimony indicated that Mrs. Dasher and Mrs. Talbott had leases from United identical in form and that both tenants were holding from month to month under the same provisions of those leases which were in effect when Mrs. Henkle was resident manager charged with the duty of applying the policy of the landlord in regard to the tenants under the leases. Mrs. Henkle's employment with United terminated in October, 1964, approximately two and one-half months prior to January 16, 1965. The party in question was held for the same girl in the same place and to celebrate the same event. Mrs. Henkle was in a position to testify in regard to the landlord's policy relative to parties and that she, as the landlord's agent, had granted the Dasher's permission to hold a birthday party for their daughter in their apartment utilizing the adjacent laundry room in accordance with that policy. Under these circumstances it will be presumed that the same policy thus established would continue

until there was a change in that policy by the landlord. See *Donner v. Calvert Distillers Corp.,* 196 Md. 475, 77 A. 2d 305 (1950) ; *McCormick on Evidence,* p. 642.

There is no suggestion in the testimony that there had been a change of policy by the landlord, and such a change would be particularly within the knowledge of the landlord. The burden of coming forward with evidence of a change in policy passed to the landlord. See *Donner v. Calvert Distillers Corp., supra,* 196 Md. at 490 ; *McCormick on Evidence,* p. 644.

There is little question that Mrs. Henkle's testimony is relevant on the question of the propriety of the actions of the tenants in going forward with the party on January 16, 1965, and also on the question of probable cause by Mrs. Tully in swearing out the warrants, particularly as this prior policy of the landlord, and its specific application the previous year to the very situation in question, was brought to the attention of Mrs. Tully prior to the issuance of the warrants. There is no specific rule of evidence which forbids the admissibility of this relevant evidence and the trial court did not abuse its discretion in admitting it. See *Haile v. Dinnis,* 184 Md. 144, 40 A. 2d 363 (1944).

### 2.

The appellants, United and Mrs. Tully, contend that the trial court erred in permitting Mrs. Dasher to testify, over objection, that no complaints were received concerning the party. They rely on the rule against "negative hearsay" and cite *Honolulu v. Cain,* 244 Md. 590, 224 A. 2d 433 (1966) and *Denver City Tramway Co. v. Hills,* 50 Colo. 328, 116 P. 125 (1911).

The evidence of Mrs. Dasher in question is as follows :

> "Q. Had you talked to any of the other tenants regarding whether they would have any objection to your holding such a party ?
> "A. Yes ; the ones that were home.
> "Mr. Butler : Objection.
> "The Court : Just a moment. Overruled.
> "The Witness : The ones that were home, sir. I told them we were holding a 13-year old party, if there was any noise whatsoever or disturbed anyone to be sure and let us know."

Mrs. Dasher was not asked and did not testify that she received no complaints *after the party began;* her inquiry was whether there was objection by some of the tenants to her having a 13 year old party at all. These tenants were invited to advise Mrs. Dasher if they were disturbed by any noise, but the matter was left there. The evidence does not indicate whether any tenants advised Mrs. Dasher that they were disturbed. In short, the appellants are complaining about testimony that was never given so that their contention about "negative hearsay" has no relevance in the present case.

3.

The appellants contend that the trial court erred in permitting Mrs. Talbott and Mrs. Dasher to testify in regard to their expenses and losses incurred in moving from the Pennbrooke Apartments (a) in view of the provisions of the expired lease and (b) because they failed to prove that these damages were caused by the occurrence on January 16, 1965, or were incurred by the plaintiffs.

(a)

Mrs. Dasher was unable to give any amount of her moving expenses. She apparently was prepared to give the cost of a new rug she was required to purchase as a result of the old rug being torn in the moving, but the trial court *sustained* the objection to the question in regard to its cost and there was no proffer of any amount paid for the new rug. She was permitted to testify that she liked the Pennbrooke Apartment in which she and her family were living, did not intend or want to move and that after her eviction by Mrs. Tully's notice to quit because of alleged disorderly conduct she moved to a new apartment which was no larger or better than the Pennbrooke Apartments but for which she had to pay $144.50 a month rent as compared with the $127.50 rent she was paying—an increase in rental payment of $17 a month.

Mrs. Talbott testified that she too liked the Pennbrooke Apartment occupied by her and her family and would not have moved but for the fear engendered by Mrs. Tully's conduct. She testified that she thought that her moving expenses were $50. This testimony came into the record prior to any objection on

the part of counsel for the defendants. There was no motion of the defendants to strike out that testimony, and there was no ruling by the trial court on such a motion. The question of this amount for moving expense—apart from being *de minimis* in nature and of little probative value in any event—has not been preserved for our consideration. See *Kennedy v. Crouch,* 191 Md. 580, 62 A. 2d 582 (1948). There was, however, an objection by counsel for the defendants prior to the answer by Mrs. Talbott that her "husband paid the bill."

It would serve no useful purpose to consider the contention of the appellants in regard to the admissibility of this testimony because, assuming, *arguendo,* that their contention was correct, the record indicates that the admission of the testimony was not prejudicial to the appellants.

The trial court in its charge to the jury in regard to compensatory damages was as follows:

"You are instructed that the plaintiff has the burden of satisfying you, that is each of them, that she suffered some special damages by the proceedings. They must prove damages conforming to legal standards. She, Mrs. Talbott and Mrs. Dasher, must prove that they were actually injured as a result of the proceedings in order to justify an award."

It will be observed that no specific items of possible special damages are mentioned, and as there was no dispute that the cost of obtaining counsel to defend the criminal charges was $200, the other rather trifling amounts are of no significance. No objection to this portion of the court's charge was made by the defendants. Then too, counsel for the plaintiffs in his opening argument to the jury did not mention any specific amounts of moving costs or increased rent. He stated to the jury:

"Now, they have some expenses, out-of-pocket expenses. They weren't large. Two hundred dollars for attorneys' fees. They had some moving expenses, loss of a week's pay, increased rent because of eviction, but these are small compared to the real damage, and that is the damage to their good name and reputation in a public record. This will last for the rest of their lives."

Counsel for the defendants did not object to this argument, did
not mention the matter of amounts in his argument to the jury
and counsel for the plaintiffs made no mention of items or
amounts in his closing argument to the jury. The trial court
also had properly instructed the jury:

> "Opening statements of counsel, closing arguments of
> counsel, are not evidence. Evidence, again, is what has
> been adduced from the mouths of the witnesses and
> from the exhibits that have been admitted."

These circumstances and the amount of the verdicts themselves
—obviously representing largely punitive damages in what the
jury considered an aggravated case of malicious prosecution—
indicate that these insignificant amounts were not prejudicial
to the appellants. We will not reverse upon rulings on evidence
which did not result in prejudice to the complaining party. See
*Rotwein v. Bogart.* 227 Md. 434, 177 A. 2d 258 (1962).

4.

The appellants contend that there was error by the trial court
in permitting Mrs. Talbott and Mrs. Dasher, over objection,
to testify to their physical ills and mental anguish resulting
from the occurrence of January 16, 1965, without competent
medical testimony being offered or proffered.

Mrs. Talbott testified that she was susceptible to migraine
headaches and as a result of the tension and excitement result-
ing from the occurrence of January 16, she had increased head-
aches. Mrs. Dasher testified that she had stomach ulcers prior
to the arrest and the occurrence of January 16 set her back
"that week, caused me to vomit and nose bleeds, which I didn't
report to work."

The plaintiffs did not offer any medical testimony as they
made no claim for any physical ailments or injuries resulting
from the occurrence of January 16. Mrs. Talbott and Mrs.
Dasher were asked to testify to their mental state and how they
felt after the arrest. As lay persons they were competent to give
evidence of such matters as nervousness, headaches and an
upset stomach developing coincidentally with the happening of
the occurrence of January 16 and continuing in the days im-

mediately thereafter. Expert testimony is not necessary to establish the causal connection for such matters of common experience, knowledge or observation by lay persons. As Judge (later Chief Judge) Prescott, for the Court, aptly stated in *Wilhelm v. State Traffic Safety Commission,* 230 Md. 91, 99, 185 A. 2d 715, 719 (1962) :

> "There are, unquestionably, many occasions where the causal connection between a defendant's negligence and a disability claimed by a plaintiff does not need to be established by expert testimony. Particularly is this true when the disability develops coincidentally with, or within a reasonable time after, the negligent act, or where the causal connection is clearly apparent from the illness itself and the circumstances surrounding it, or where the cause of the injury relates to matters of common experience, knowledge, or observation of laymen."

The testimony in the present case does relate to such matters of "common experience, knowledge, or observation of laymen" and is not of the type involved in the *Wilhelm* case and in *Johnson v. Zerivitz,* 234 Md. 113, 198 A. 2d 254 (1964), relating to the relationship between a mental condition and a muscle injury which required competent medical testimony to establish. In our opinion, there was no error in the admission of this evidence.

## 5.

The final contention of the appellants in regard to alleged errors of the trial court in the admission of evidence relates to the admission of the testimony of Mrs. Patricia Ann Lunsford in regard to the reputation of Mrs. Dasher.

The evidence in question was as follows :

> "Q. (By Mr. Leach, counsel for the plaintiffs) : How long have you known the plaintiff, Mrs. Dasher? A. About four years.
>
> "Q. Am I correct that you lived next to her, in the next apartment? A. Yes, sir.

"Q. Are you acquainted with Mrs. Dasher's family?
A. Yes, sir.

"Q. How well would you say that you know them?
A. Just casually.

"Q. Do you have any knowledge of the reputation of Mrs. Dasher? A. Yes, sir.

"Q. Would you state what it is?

"Mr. Butler (counsel for the defendants): Objection.

"The Court: Now why?

"Mr. Butler: There is [not] a proper foundation laid for this question, Your Honor, and I respectfully object to the question as phrased.

"The Court: Overruled.

"The Witness: Yes, sir. They are very respectful people."

The appellants properly point out that evidence of good character in malicious prosecution cases is admissible as part of the case of the plaintiffs in chief without the necessity of waiting for the introduction of evidence by the defendants that the plaintiffs did not have a reputation for good character in the community. This is because, the question of an existing reputation for good character has relevance upon the issue of probable cause, as it is less likely that a person enjoying a reputation for good character would commit a crime than it would be for a person not having such a reputation. *Sappington v. Fairfax*, 135 Md. 186, 108 A. 575 (1919).

Although the questions addressed to Mrs. Lunsford were not in proper form and the question in regard to the basis of her knowledge of Mrs. Dasher's general reputation in the community was asked before a sufficient foundation was laid for that question, we are of the opinion that the errors were harmless in that there was no evidence introduced by the defendants to seek to establish the lack of a good reputation by Mrs. Dasher and there was no contention by the defendants that the usual presumption that a person's reputation is good until the contrary is shown had been rebutted in any way. See *Lewis v. Williams*, 105 S. C. 165, 89 S. E. 647 (1916); 31A C.J.S. § 122, p. 221.

Then too the answer of the witness, i.e., that *"They* are very *respectful* (sic) people," (emphasis supplied), was not really responsive to the question propounded and did not purport to be a statement in regard to the good general reputation of *Mrs. Dasher* in the community. In our opinion, the defendants were not injured by this answer.

The appellants contend that the trial court erred in permitting counsel for the plaintiffs to argue to the jury in his opening argument that to arrest a person without probable cause was a direct threat to the freedom of the individual and that the preservation of freedom from such an arrest was to the interest of everyone.

Counsel for the plaintiffs made a strong and forceful argument to the jury which obviously impressed the jury. The portions of the opening argument to which the defendants objected were as follows:

"Now, this didn't happen to me, it didn't happen to my co-counsel. Someone has said the pebble doesn't hurt at all when it is in someone else's eye. Remember this, when one man's freedom is threatened everybody's freedom is threatened. If you give your approval this day to this and this and this, I say that there is no one in this country that is safe, that is safe from the same identical thing happening to them.

"Mr. Butler: Your Honor, at this point I am going to have to object as being improper argument, and not being properly within the scope of the testimony of this case.

"The Court: Objection overruled.
\* \* \*

"Mr. Leach: Ladies and gentlemen of the jury, I ask you send a message forth from this courtroom over this county. Let the word go forth from this courtroom that if you falsely arrest and prosecute someone in Prince George's County on a criminal charge you are going to pay a heavy penalty for it. By finding for the plaintiffs, awarding them compensation for their injury, and punitive damages sufficient to

warn anybody that thinks they can try this and get away with it, that it would stop them. A lot of people would be willing to pay $100 or $500 to get even with someone.

"Mr. Butler: Your Honor, again I must object. This is improper.

"The Court: Overruled."

In a malicious prosecution case, like the present case, in which the jury would be warranted in finding from the evidence that the arrest was without probable cause and involved an aggravated case of malice, and in which a substantial claim for punitive damages is made, we are of the opinion that the argument complained of was not beyond the limits of propriety and that the trial court properly overruled the objection.

In any event, there was no motion for a mistrial or any request by counsel for the defendants to the trial court to instruct the jury to disregard the remarks, so that the alleged error is not preserved for our consideration. *Brinand v. Denzik,* 226 Md. 287, 173 A. 2d 203 (1961).

The final contention of the appellants is that the trial court erred in not granting the motion of the defendants for a directed verdict. Motions for a directed verdict were made by the defendants both at the end of the plaintiffs' case and at the end of the entire case. There are two thrusts to the defendants' argument: (a) that Mrs. Dasher had testified that she had stated in the presence of Mrs. Tully that she would continue the party until 11:00 p.m. and that the party was in progress when Mrs. Tully left the laundry room, so that Mrs. Tully had probable cause to swear out the warrants as a matter of law, and (b) the plaintiffs failed to prove any damages causally connected to, and recoverable as a result of, the occurrence of January 16, 1965.

(a)

It is well established that when a defendant moves for a directed verdict in his favor he must, for the consideration of the motion, concede the truth of all facts that tend to support the right of the plaintiff to recover as well as all inferences which might naturally and reasonably be deduced from those

facts, even though these facts may be contradicted. If there is any legally relevant and competent evidence from which a rational mind could infer a fact in issue, the trial court should not invade the province of the jury by directing a verdict for the defendant. *Smack v. Whitt,* 249 Md. 532, 536, 240 A. 2d 612, 615 (1968) ; *Plitt v. Greenberg,* 242 Md. 359, 219 A. 2d 237 (1966).

Viewed in the light most favorable to Mrs. Dasher, she did not state that she would continue the party until 11 :00 p.m. *in the laundry room.* There was testimony which indicated that Mrs. Dasher began to move the party out of the laundry room and into her apartment after Mr. Uhal had suggested this and when Mrs. Tully and the police officers arrived there were no party guests still in the laundry room. Furthermore, the music was not playing. Officer Blandford testified that he saw no disorderly conduct and did not hear any excessive noise. Mrs. Tully, herself, admitted that parties were permissible at any hour if they did not disturb the tenants in the neighboring apartments. The lease prohibited *loud noises after* 11 :00 p.m., but *did not specifically prohibit* parties being held in the laundry room.

Then too, as we have already stated, there was evidence indicating that Mrs. Tully was not activated by a proper public motive in swearing out the warrants, but rather was motivated by private malice because the defendants did not, in her opinion, show her proper respect. This evidence, coupled with the service of Mrs. Dasher personally by Mrs. Tully with an eviction notice giving as the reason for the eviction the alleged disorderly conduct of Mrs. Dasher, presented sufficient evidence, with the reasonable inferences derived from it, from which the jury could find a want of probable cause in swearing out the warrants.

### (b)

In regard to damages resulting from the issuance of the warrants and arrest of the defendants, the amount of $200 for a counsel fee for legal services required to defend the defendants in the criminal charges was proved without objection. The appellants contend that this was not paid by the appellee but was

paid by Mr. Dasher, husband of Mrs. Dasher and father of Mrs. Talbott, and was paid by him "as necessaries" for his wife. Mrs. Dasher and Mrs. Talbott had the power to contract for these legal services and to sue or be sued upon their contracts. Maryland Code (1957) Article 45, Section 5. The appellees were entitled to recover the amount of this legal fee as part of their special damages, even though it was paid by someone else. See *Plank v. Summers,* 203 Md. 552, 102 A. 2d 262 (1954).

Moreover, as no objection was made in regard to this item by counsel for the defendants, any objection to it cannot now be raised in this Court. Maryland Rule 522. See *Fowler v. Benton,* 229 Md. 571, 185 A. 2d 344 (1962).

We have already discussed the principal questions in regard to moving expenses and the nervousness, headaches and stomach upset resulting from the occurrence of January 16, 1965, and no further comment is necessary.

In our opinion, there was sufficient evidence from which the jury could find that the plaintiffs had sustained an actual loss which would entitle them to compensatory damages resulting from the occurrence of January 16, 1965. As we have indicated, there was sufficient evidence which would justify the awarding of punitive damages by the jury.

> *Judgment affirmed, the costs to be paid by the appellants.*