Swed Distributing Company v. Commissioner.
Swed Distributing Co. v. Commissioner
Docket No. 58892.
United States Tax Court
T.C. Memo 1962-41; 1962 Tax Ct. Memo LEXIS 267; 21 T.C.M. (CCH) 233; T.C.M. (RIA) 62041; February 28, 1962
*267 Dorothy Ann Kinney, Esq., and Sterling E. Kinney, Esq., for the petitioner. Douglas M. Moore, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined deficiencies in income tax and excess profits tax of petitioner as follows: Year Ended
Tax
Deficiency
July 31, 1951
Income and Excess Profits
$ 7,337.37
July 31, 1952
Income and Excess Profits
8,340.12
July 31, 1953
Income and Excess Profits
24,619.78 The sole question is whether petitioner is entitled to deduct as ordinary and necessary business expenses the amounts of $15,075.40, $16,038.69, and $19,497.72, paid by it to Swed and Sullivan, a partnership composed of petitioner's principal stockholders. After hearing on the issues raised by the notice of deficiency this Court filed its Findings of Fact and Opinion on October 17, 1958, and on October 23, 1958, entered its decision in favor of respondent and against petitioner. Swed Distributing Co., 31 T.C. 84. Thereafter petitioner appealed this Court's decision to the Court of Appeals for the Fifth Circuit, which court, on December 4, 1959, rendered its opinion *268 and on January 11, 1960, issued its judgment reversing and remanding this cause to us "for futher and not inconsistent proceedings in accordance with the opinion of this Court." That opinion, Swed Distributing Company v. Commissioner, 272 F. 2d 330, reads in part: In what we have said we have not, of course, meant to state that if, on another trial, it is made to appear that the realities of the transaction were that Swed and the company intended that the contract should be cancelled; and that Swed, in using the moneys of the partnership, had merely advanced them to the company with the intention that the company would repay him; or that, whether repaid or not, the company should have the benefit of them; these facts would make out a case for a finding that the continuance of payments under the Hinzpeter contract would be a necessary and ordinary expense of petitioner. What and all that we are deciding is that, upon this record, in view of the tendered evidence and of the contentions made by the Tax Court and the commissioner, that there might be other reasons which would make the denial of the deductions correct, we, without making any determination upon what the *269 decision should be if and when the evidence is fully developed, reverse the judgment and remand the cause to the Tax Court for a full and complete trial in which all the applicable issues and all the facts pertaining thereto are fully developed and determined. Reversed and Remanded for further and not inconsistent proceedings. Further proceedings were held on May 1 and 2, 1961, as a result of which we have made the findings below, in addition to and in lieu of certain findings made at the original trial of this cause. Revised Findings of Fact Some of the facts have been stipulated, and are so found. The petitioner, Swed Distributing Company, is a corporation doing business in the State of Florida and with its principal place of business in Tampa, Florida. It filed its income and excess profits tax returns for the fiscal years ending July 31, 1951, and July 31, 1952, with the then collector of internal revenue for the district of Florida, and its income and excess profits tax return for the fiscal year ended July 31, 1953, with the director of internal revenue for the district of Florida. Petitioner's principal stockholders during the years in question were Louis Swed (hereinafter *270 referred to as Swed) and John L. Sullivan (hereinafter referred to as Sullivan). Swed, the active participant, and Sullivan, a Texas oilman, had engaged in the business of operating a beer distributorship in the State of Texas. Through a man named George O. Hinzpeter (hereinafter referred to as Hinzpeter) they were able to acquire distributorships for Budweiser beer in the State of Florida. On December 30, 1944, Swed and Sullivan entered into a partnership agreement for the purpose of conducting and operating this distributorship in the State of Florida under the firm name, Swed Distributing Company. It was provided in their agreement that Swed should manage the business and receive a salary. The remaining profits were to be divided equally between the partners. On June 1, 1945, a new partnership agreement was executed wherein Hinzpeter became a partner in the business. Under the new agreement Hinzpeter was to receive 35 percent of the net profits of the business and Swed and Sullivan were each to receive 32 1/2 percent. It was specifically provided that Hinzpeter was under no obligation to contribute capital, but was to devote his time and services to the partnership. This agreement *271 was made retroactive to February 1, 1945. Prior to April 30, 1945, Hinzpeter had been an employee of Anheuser-Busch, Inc., of St. Louis, Missouri, the brewers of Budweiser beer, and had at one time been in charge of all of Anheuser-Busch's distributors in the south. At the time he was granted a partnership interest in the Swed distributorship, beer was in short supply. J. J. Carroll (hereinafter referred to as Carroll) had become general sales manager of Anheuser-Busch, Inc., in 1933. By 1944 he had also become a vice president of Anheuser-Busch, and retained both positions until his death on November 10, 1949. Carroll was Hinzpeter's supervisor at Anheuser-Busch at all times after 1933. During the period 1945 through 1949 Carroll had the complete power to hire and fire Hinzpeter and any other employee of the sales department of the brewery division of Anheuser-Busch. They worked together closely and had a shakedown scheme by which they made money on the side from distributors. Hinzpeter's inclusion in the partnership and subsequent agreements was solely because of Carroll's insistence. Swed agreed to this originally because Carroll could decide who would get or lose distributorships *272 and he acceded to Carroll's subsequent demands because neither he, any of his partnerships, nor petitioner ever had a franchise from Anheuser-Busch and the continuance of the distributorship and the amount of beer received thereunder were in Carroll's control. When Hinzpeter resigned from Anheuser-Busch in 1945 to obtain his 35 percent interest in the June 1, 1945, partnership, he understood that 20 percent was to go to Carroll and that he was to retain only 15 percent. On October 1, 1945, Swed, Sullivan, and Hinzpeter entered into a new agreement wherein their partnership was dissolved "as of the date of its purported inception," and in its place the partnership of December 30, 1944, between Swed and Sullivan was reinstated. As a part of the consideration for this agreement Hinzpeter received a contract of employment from the reinstated partnership. This contract of employment, dated October 1, 1945, provided that Hinzpeter was to be employed by the Swed Distributing Company (partnership) in the capacity of supervisor of sales and public relations and as a consultant. Pursuant to the contract it was provided that Hinzpeter was to receive a salary of $1,000 per month, and in *273 addition thereto was to receive a bonus or commission of 15 percent of the net profits of the business of the partnership. The employment contract also provided that if Hinzpeter should not devote his entire time to the business of the partnership his salary would be reduced but that his interest in the net profits of the business would continue so long as he should render services of a consultatory nature. There was no express termination date for Hinzpeter's employment under this contract. As time went on, Swed became dissatisfied with Hinzpeter as an active employee of the business. He felt that Hinzpeter, although being acquainted with the problems of dealing with distributors, did not understand the problems of operating a distributorship and the problems involved in dealing with retail outlets. This was of some worry and concern to Swed. Swed complained to Carroll that Hinzpeter was likely to get in trouble with Florida officials and that it would be very desirable to have Anheuser-Busch rehire Hinzpeter. Meanwhile, in July of 1946, petitioner was organized to take over and carry on in corporate form the business of the partnership. Among the assets and liabilities transferred *274 to it by the partnership was Hinzpeter's contract of employment. Petitioner gave its one-year 4 percent demand notes for said assets and liabilities in the amount of $224,323.43, of which $134,594.06 was payable to Swed and $89,729.37 to Sullivan. Swed owned 60 percent (30 shares) and Sullivan owned 40 percent (20 shares) of the stock of petitioner from its organization on July 26, 1946, to September 25, 1948. One share of Swed's stock was issued as a qualifying share to Arthur L. Anderson, assistant secretary and assistant treasurer and a director of petitioner. On July 1, 1946, Swed and Sullivan formed a partnership known as Swed and Sullivan, in which each had an equal interest and shared equally in profits and losses. Soon thereafter, on October 1, 1946, an agreement (hereinafter called the contract) was entered into between Hinzpeter and petitioner wherein the October 1, 1945, employment contract between Hinzpeter and the Swed Distributing Company (partnership) was canceled and terminated. In consideration of the cancellation of the employment contract petitioner agreed to pay Hinzpeter 15 percent of its net profits after taxes. The pertinent provisions of the contract are: *275 WHEREAS, party of the second part [Hinzpeter] contemplates withdrawal from active and continued participation in the business conducted by party of the first part [petitioner], and the parties hereto [Hinzpeter and petitioner] have agreed to terminate the aforesaid Contract of Employment dated October 1, 1945, and WHEREAS, it is recognized that [Hinzpeter], through his efforts and counsel, has contributed to the establishment and success of the business of [petitioner], which contributions form the basis of a part of the consideration for this agreement, and * * *
NOW, THEREFORE, in consideration of the premises, and in consideration of the cancellation and termination of the aforesaid Contract of Employment dated October 1, 1945, and pursuant to a resolution of the Board of Directors of [petitioner], it is agreed as follows: (1) That the Contract of Employment * * * dated October 1, 1945, be and the same is hereby cancelled and terminated, and all rights and obligations of the parties thereunder shall cease and determine. (2) That subject only to the conditions hereinafter stated, [petitioner] agrees to pay unto [Hinzpeter] a sum equal to fifteen percent *276 (15%) of the net profits (after taxes) of [petitioner], payable annually within 60 days of the close of the fiscal year of [petitioner]. It is expressly understood and agreed between [petitioner and Hinzpeter] that payment of the proportion of net profits hereinabove provided shall continue only during the lifetime of [Hinzpeter], and shall terminate at any time [petitioner] should be deprived for any cause of the privilege of distributing Budweiser beer in any of its branches now established in the State of Florida, it being the intent hereof that this contract shall remain in force during the lifetime of [Hinzpeter], provided [petitioner] retains the right of distribution of Budweiser beer in all of its branches operated in the State of Florida. Carroll dictated the terms of this contract and compelled its execution. It was not signed until he approved. Swed had no desire to give Hinzpeter this or any other contract, but entered into it on behalf of petitioner because the only alternative was the immediate termination by Carroll of petitioner's distributorships. Under this contract Hinzpeter performed and was expected to perform no services. The conditions for continued *277 payments stated in the last paragraph of the contract quoted above remained in existence at all times relevant herein. During the fall of 1947 Swed became disgusted with the beer business. He told Carroll and Hinzpeter that he was ready to quit because his personal income was inadequate. One of his chief concerns was that, in addition to the payments to Hinzpeter, he was required to make cash payments to Carroll from his own personal funds, which payments he did not deduct on his own tax returns. Carroll was disturbed at the threatened loss of this valuable source of side income, and when Swed indicated that he would stay on if Hinzpeter's 15 percent was eliminated, Carroll agreed to negotiate with Hinzpeter about it. Anheuser-Busch, Inc., had at all times a company policy against its employees having employment contracts with its distributors. According to Anheuser-Busch's sales service manager, Such a policy always existed, based on good business practice as well as on the prohibition of many states, which in turn makes the Federal Regulations applicable also, that no employee of a firm licensed to manufacture alcoholic beverages may have a financial interest in any other type *278 of licensee dealing in intoxicating liquor or nonintoxicating beer. Early in November 1947, Swed attended the National Beer Wholesalers' Convention in New York where most distributors complained about pay-offs to brewery officials and about such officials having interests in distributorships. As a result an investigation was begun, the results of which were to be reported to the United States Brewers Foundation. Anheuser-Busch cooperated with the investigation. The policy of Anheuser-Busch quoted above was implemented in 1947 by requesting of all personnel in the selling organization assurances that all interests in distributorships would be terminated, or else these employees would be expected to resign. Thereafter, Swed received a telephone call from Carroll stating that he would procure the Hinzpeter contract for $25,000 in cash. Swed drew a sight draft for $25,000 on the Alamo National Bank and deposited said draft in the account of Swed and Sullivan, the partnership, in a Tampa, Florida, bank. He then drew a check on the partnership which he cashed in a Hollywood, Florida, gambling casino. He then took the cash, in $50 bills, to St. Louis. The cost of his transportation *279 was billed to and paid by petitioner. Carroll visited Swed at the latter's hotel room in St. Louis on November 29, 1947. Swed gave Carroll the $25,000 and Carroll left to get the contract. He went to where Hinzpeter's wife Josephine was staying and obtained the contract from her, but did not give her the cash. Hinzpeter at this time was in California working for Anheuser-Busch as a district manager. Josephine Hinzpeter had come to St. Louis in November 1947 because Carroll had wired Hinzpeter to deliver the contract. After an elapsed time of 3 1/2 hours Carroll returned to the hotel room with the contract and a bottle of liquor, purportedly a gift from the Hinzpeters. Thereafter, petitioner made the following payments claimed to be in respect of the agreement of October 1, 1946, which agreement has not been endorsed in any manner: Fiscal Year
Ending July 31
Amount
Paid To
1947
$20,852.72
Hinzpeter
1948
18,378.65
Swed and Sullivan
1949
17,001.35
Swed and Sullivan
1950
15,089.27
Swed and Sullivan
1951
15,075.40
Swed and Sullivan
1952
16,038.69
Swed and Sullivan
1953
19,497.72
Swed and Sullivan
The partnership had only $1,936.40 in its *280 bank account when the draft was drawn, so Sullivan's son-in-law, B. C. Garnett, agreed to cover the draft and wrote a check for $25,000 dated November 26, 1947, (the same date as the draft) to the Alamo Bank to do so. The Alamo Bank repaid Garnett and obtained a note from petitioner in the same amount. Petitioner paid this note on March 4, 1948, debiting its own notes payable to Swed and Sullivan. [1] On November 26, 1947, petitioner had several hundred thousand dollars in its bank account. Carroll died on November 10, 1949. Hinzpeter resigned from Anheuser-Busch on February 2, 1950. From September 25, 1948, to the date of John L. Sullivan's death, November 2, 1955, the stock of petitioner *281 was equally owned by Louis Swed and John L. Sullivan. Four of Sullivan's shares, which he continued to own, were issued to his son-in-law, B. C. Garnett, on September 25, 1948. The stock of John L. Sullivan, which was community property, was owned equally by his widow, Georgia E. Sullivan, and his estate from his death until petitioner was dissolved. The officers of petitioner in November 1947 were Louis Swed, president; John L. Sullivan, vice president and secretary; and Arthur L. Anderson, assistant secretary and assistant treasurer. On December 9, 1947, B. C. Garnett also was elected vice president to serve with the other officers previously named. Louis Swed and John L. Sullivan also were directors of petitioner. Petitioner was dissolved and its assets distributed to its stockholders on November 18, 1960. The above payments to Swed and Sullivan for the fiscal years ending July 31, 1951, 1952, and 1953, were not ordinary and necessary business expenses of petitioner within the intendment of section 23(a)(1)(A) of the Internal Revenue Code of 1939. [2]
*282 Opinion The facts which have come to light on the hearing under the remand in this case portray a picture so vastly different from that shown by the original trial that little relationship exists between the two. It is now clear that the payments made to Carroll and to Hinzpeter were made solely so that Carroll would continue to guarantee that beer in ample quantities would be made available to petitioner. Therefore these payments were in effect a current cost of beer to petitioner, representing the current cost of Carroll's cooperation from time to time. Thus the death of Carroll in 1949 caused the reason and consideration for these payments to terminate, and ended petitioner's obligation to pay pursuant to the contract since the services for which the payments were being made were no longer being rendered. See W. D. Haden Company, 37 T.C. - (December 21, 1961). The contract itself refers only to payments to Hinzpeter for his life or until petitioner was deprived of any branch distributorship. However, Swed testified as follows when asked why he entered into the contract: Q. Without Carroll's insistence, would the corporation have been willing to give Hinzpeter a contract *283 for life? A. If I wouldn't have given him the contract for life as per instructions of Mr. J. J. Carroll, I would have been out as a distributor the next day. Q. Well, did the corporation consider this contract necessary? A. We were compelled to. In substance, petitioner and Swed (individually) were paying Carroll "under-the-table" payments in order to get beer at the close of World War II. Hinzpeter was no more than the "front man" for Carroll and performed no services for petitioner after October 1, 1946. Swed testified that Hinzpeter was paid solely because Carroll insisted that he be paid. [3] When the contract was entered into on October 1, 1946, petitioner had little choice but to agree to pay Hinzpeter, even though Hinzpeter at that point was of no assistance to it. [4]
*284 However, by November 29, 1947, the picture had changed. The wholesalers' organization had begun investigating the shakedown schemes of brewery officials such as Carroll. Anheuser-Busch was also acting to terminate all interests which its selling employees had in any distributorships. Both Swed and Carroll knew that the pay-offs pursuant to the contract would soon have to be terminated, and therefore Swed was able to procure the transfer of an onerous and dictated contract at a cost of a little over 1 year's payment thereunder. Swed had threatened Hinzpeter that unless the payments ended, he (Swed) would "go to the president of Anheuser-Busch." Swed, Carroll, and Hinzpeter all were concerned over the possibility that the investigation of pay-offs to brewery officials then being instigated by the National Beer Wholesalers Association might disclose their arrangement. Under these circumstances the readiness of Carroll and of his cat's-paw Hinzpeter to yield the formal writing for a relatively small sum of money is quite understandable, since it was imperative to all men involved that Hinzpeter's interest in petitioner's profits be terminated immediately to avoid detection and embarrassment *285 to all concerned. Thereafter, petitioner did not have to pay off Hinzpeter, the strawman, although the secret cash payments from Swed to Carroll continued until the latter's death in 1949. From the foregoing it is clear that petitioner and Swed were compelled to pay Carroll and, at his direction, Hinzpeter, in order to procure beer. These payments were at Carroll's insistence, were bribes, and were made solely for his (Carroll's) continued cooperation. In November 1947, Swed saw an opportunity to eliminate part of the pay-offs (i.e., Hinzpeter's contract), and did so. Thereafter his only pay-off, in return for a regular supply of beer, was in cash directly to Carroll. After November 29, 1947, petitioner received no consideration for its payments under the Hinzpeter contract. Carroll, after his death, (and Hinzpeter) no longer performed any services or received any benefits under it. Such payments were no longer paid to secure beer through Carroll, and were merely payments by petitioner to its shareholders not in return for any consideration, hence they were not ordinary or necessary business expenses. Lengsfield v. Commissioner, 241 F. 2d 508 (C.A. 5, 1957), affirming *286 a Memorandum Opinion of this Court; Paramount-Richards Th. v. Commissioner, 153 F. 2d 602 (C.A. 5, 1946), affirming a Memorandum Opinion of this Court. Our resolution of the case makes it unnecessary to decide the alternative arguments advanced by respondent. Decision will be entered for the respondent. Footnotes
1. No interest appears to have been paid on these notes. They were not paid at their original maturity. The record is silent as to whether the $25,000 was charged in the 60-40 ratio in which petitioner's stock and the notes were held or in the 50-50 ratio of the partnership. The record is likewise silent as to why the notes were issued in the 60-40 ratio (as was the stock of petitioner) instead of the 50-50 ratio of the partnership contributing the assets for which the notes were issued.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *↩
3. Swed testified as follows: Q. Well, now, as I understand the substance of this, you had to agree to make some extra payments on the side? A. That's correct. Q. Could you have gotten those Florida distributorships without making such a deal? A. No, ma'am. Q. Who suggested that Hinzpeter be included in this deal? A. Mr. Carroll. ↩
4. Swed explained why he entered into the various contracts thusly: Q. Well, Mr. Swed, will you make - will you explain to the Court just why you were willing to make these various contracts? A. Because I was making money out of the beer business and I followed the instructions of Mr. J. J. Carroll who was vice president and sales manager of Anheuser-Busch. Otherwise, I couldn't have had these distributorships. Q. Would you have been in any danger of losing them? A. Yes, ma'am. Q. Would you have lost them? A. If I wouldn't have accepted the terms, I would have lost them.↩