DIXIE MACHINE WELDING & METAL WORKS, INC., Appellant,

v.

UNITED STATES of America, Appellee.

No. 19834.

United States Court of Appeals Fifth Circuit.

March 21, 1963.

**440**

Rene H. Himel, Jr., H. Paul Simon, Eberhard P. Deutsch, Deutsch, Kerrigan & Stiles, New Orleans, La., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Meyer Rothwacks, Lee A. Jackson, Ralph A. Muoio, Attys., Washington, D. C., Louis A. LaCour, U. S. Atty., Peter E. Duffy, Asst. U. S. Atty., New Orleans, La., for appellee.

Before RIVES, Circuit Judge, and BOOTLE and WEST, District Judges.

BOOTLE, District Judge.

Is it the province of the Internal Revenue Service to set itself up as a censor of business ethics? Were that, thus broadly stated, the question for decision, much of appellant's argument, by brief and orally, would be unanswerable. That argument supported by numerous decisions and law review articles proceeds something like this: "Moral turpitude is not a touchstone of taxability."[1] The disallowance of deductions upon considerations of public policy suggest criteria too vague and amorphous for acceptance. "Tax laws should give plain notice of their commands. A statute which either forbids or requires the doing of an act 'in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application' violates 'the first essential of due process of law.' "[2]

The object of the income tax bill of 1913 was "to tax a man's net income, that is to say, what he has at the end of the year, after deducting from his receipts his expenditures or losses. It is not to reform men's moral character; that is not the object of the bill at all."[3] "[M]oral turpitude is a very poor criterion for taxability and * * * in the interests of good tax administration, Uncle Sam shall take his taxpayers as he finds them, exact his normal share of their net income, and let someone specifically charged with the job punish them for their sins. If the tax collector is required to sit in judgment on the morals of his clients, he will be doing something for which he has neither the training nor the knowledge and he will be adding to his already heavy administrative burdens. Furthermore, uneven and discriminatory application of the tax laws will result. There are too many different types and degrees of wickedness, and there are too many different attitudes toward sin on the part of tax·

---

1. Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 408, 66 S.Ct. 546, 549, 90 L.Ed. 752, 755 (1946).

2. Paul, The Use of Public Policy by the Commissioner in Disallowing Deductions, 1954 Major Tax Problems, (Southern California Tax Institute) 715, 741.

3. 50 Cong.Rec. 3849. (Remarks of Senator Williams)

officials and judges." [4] The Internal Revenue Code should not be used as a "mandate for extirpating evil"; espousal of the public-policy concept would result in a tax on gross rather than net income, and thus be "inconsistent with a code geared to the latter concept"; the public policy which declares a payment illegal also prescribes stated penalties therefor, and it would be inconsistent with the policy of the statute to add another penalty—loss of a tax deduction—not contemplated thereby; the tax penalty resulting from disallowance of claimed deductions might be absurdly disproportionate both to the nature of the offense and to the penalty therefor prescribed by statute; attempted enforcement by federal tax authorities of the policy of state statutes would have far reaching effects, of dubious advantage, on the distribution of law enforcement powers between the federal and state governments; and the state statutes or regulations relied upon as expressive of state policy may be but dead-letter proscriptions, "nominal, not effective law", and not expressive of current community sentiment at all.[5] And not overlooked is the comment of Mr. Justice Burrough in England nearly a century and a half ago: "I, for one, protest, as my Lord has done, against arguing too strongly upon public policy;—it is a very unruly horse, and when once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail." [6]

Some of appellant's arguments have been thus lengthily summarized to demonstrate the forcefulness they would have, how unanswerable they would be, were the question here as broad as that above stated. Unfortunately for appellant, however, the precise question in this case is much narrower. Appellee nowise claims such carte blanche for the Internal Revenue Service.

The question for decision is whether certain payments made by appellant, a ship-repair yard of New Orleans, to officers of foreign ships are deductible as ordinary and necessary business expenses under § 23(a) (1) (A) of the 1939 Code;[7] or nondeductible because violative of Louisiana's Commercial Bribery Statute[8] and of Louisiana's public policy

4. Reid, Disallowance of Tax Deductions on Grounds of Public Policy, A Critique, 17 Fed.B.J., 575, 578.

5. Comment, Business Expenses, Disallowance, and Public Policy, 72 Yale L.J. 108 (1962).

6. Richardson v. Mellish, 2 Bing. 229, 252, 130 E R 294, 303 (C P-1824).

7. Internal Revenue Code of 1939:
   "§ 23. Deductions from gross income.
   "In computing net income there shall be allowed as deductions:
   "(a) [As amended by Sec. 121(a), Revenue Act of 1942, c. 619, 56 Stat. 798] Expenses.
   "(1) Trade or business expenses.
   "(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *."
   26 U.S.C. § 23 (1952)

8. La.Rev.Stat., Title 14 (1950)
   Sec. 73. Commercial bribery.
   "Commercial bribery is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any private agent, employee, or fiduciary, without the knowledge and consent of the principal or employer, with the intent to influence such agent's, employee's, or fiduciary's action in relation to the principal's or employer's affairs.
   "The agent's, employee's or fiduciary's acceptance of or offer to accept, directly or indirectly, any thing of apparent present or prospective value under such circumstances shall also constitute commercial bribery.
   "The offender under this article who states the facts, under oath, to the district attorney charged with prosecution of the offense, and who gives evidence tending to convict any other offender under this article, may, in the discretion of the district attorney, be granted full immunity from prosecution for commercial bribery, in respect to the particular offense reported.
   "Whoever commits the crime of commercial bribery shall be fined not more than five hundred dollars, or imprisoned for not more than one year, or both."

as defined and expressed by said statute and by the decisions of its highest courts?

As a reading of the Commercial Bribery Statute discloses, a subsidiary and threshold factual question is whether the payments were made "without the knowledge and consent" of the employers of the payees, that is to say, the owners of the foreign ships?

This subsidiary question demands priority of treatment. The Government's contention is that the payments are nondeductible because to allow such deduction would frustrate the sharply defined public policy of the State of Louisiana. For the Government to prevail on this contention it is necessary that the payments be made in violation of the Commercial Bribery Statute including the element of being "without the knowledge and consent" of the ship owners. Unfortunately for appellant, that issue has been found as a fact against it by the District Court before whom by stipulation all issues were tried without a jury.

Before adverting further to the action of the trial court the nature and circumstances of the payments should be related. The facts, as summarized in appellee's brief, are as follows:

"Taxpayer is a corporation engaged in the ship-repair business in New Orleans, Louisiana. During its fiscal years ended June 30, 1951, and June 30, 1952, repairs on foreign ships accounted for a substantial part of taxpayer's total business.

"Generally, repair work to be done on foreign ships is let out by the ship's captain and chief engineer who have the sole prerogative of selecting the ship-repair yard. During the years in question, foreign ships, upon arrival in the Port of New Orleans, were met by representatives of the taxpayer who attempted to solicit the repair business. It was generally known that taxpayer was willing to pay the officers of foreign ships a percentage of the repair bill in order to obtain the business. According to taxpayer, the captain and chief engineer expect these payments, and if not given, taxpayer would not get the business or the cooperation of the crew during the performance of the repairs. It was, therefore, taxpayer's practice to kickback approximately 10% of the repair bill to the captain and chief engineer of all foreign-owned ships repaired by it. Similar payments were not made to officers of American ships because repair work on these ships is let out by American agents rather than by the captain and chief engineer.

"The repair jobs on foreign ships were performed on a time and material basis. After the bill for actual man-hours and materials had been computed, an amount of 14 to 15% was added to it to cover the 10% kickback to the ship officers plus 4 to 5% for withholding tax purposes. This additional amount was not specifically ear-marked, but was included in the bill by increasing the number of man-hours spent on the job.

"Upon completion of the repairs, taxpayer's representative carried the invoice to the ship for approval by the chief engineer and the captain. Usually the invoice was taken to the chief engineer first who signed it to indicate that the repairs had been satisfactorily performed. Having obtained his signature, the representative would give the chief engineer a sealed envelope containing approximately 5% of the repair bill in cash. The invoice was then taken to the captain, who after signing it, also received 5% of the repair bill in cash. No receipts were obtained. The invoice, being approved for payment, was then sent either directly to the owners or to their agents in the United States.

"Kickbacks totalling $41,940.01 and $79,311.43, for the fiscal years

1951 and 1952 respectively, were claimed as deductions by taxpayer in its income tax returns for those years. The District Director disallowed the deductions on the grounds that the payments, made without the knowledge and consent of the ship-owners, violated the Louisiana Commercial Bribery Statute, * * * and were therefore not deductible as ordinary and necessary business expenses. Taxpayer was assessed additional taxes in the amount of $24,796.22 for 1951 and $63,191.49 for 1952, together with interest in the amount of $22,980.88.

"Taxpayer paid the additional assessment * * * and instituted the present suit for refund * * *."

Additionally, appellant contends that the payments were made in accordance with a long-standing universal[9] custom among ship-repair companies; they were made for two reasons: (1) any repair yard which did not make them would get no work on foreign-flag vessels, and (2) they were made in consideration of assistance rendered by the vessels' officers and crews, whose cooperation in various ways is essential to quick and efficient repair work, particularly since these repairs are generally made while the crew is at work loading or unloading; that these are the only reasons motivating the payments, and that they are not bribes to buy approval of bad work. Appellant emphasizes also that it, during the entirety of its business career of nearly half a century, has made similar payments to officers and members of crews of foreign vessels, has entered them openly on its books, and has always —beginning long before the controversy in suit—made full reports thereof, and remitted all taxes withheld therefrom, to the Government, which has, except as to the years here involved—both before and since—always allowed deduction thereof.

The case was submitted for decision by the court below on the record consisting of pleadings, affidavits, depositions, and exhibits, no witnesses being heard in open court. In its effort to prove the alleged universal custom and that the ship owners with whom we are here concerned knew about it, taxpayer used many affidavits and depositions. The Government also used many affidavits. Taxpayer used, among others, depositions of four steamship agents, one ship repairer, and three former foreign ship officers, two of whom were subsequently employees of taxpayer; and numerous affidavits of foreign ship owners and operators, of whom four were from Italy, four from the Netherlands, three from Denmark, two from Norway, one from Brazil, one from Germany, one a former master of Yugoslav and Panamanian vessels, and one identified as a foreign ship captain. All these deponents and affiants testified generally in support of the existence of the custom and that it was usual and customary to make these payments and that they were not objectionable from the ship owners' point of view because they facilitated and accelerated the repairs. Many of these witnesses testified that in their opinion it was generally known to ship owners that these payments were customarily made, and that it was particularly known to those owners who were formerly ship masters. The Government sharply disputed taxpayer's contentions that the practice was universal, that it was well known in shipping circles, and that it was known to ship owners in general or to the owners of ships repaired by taxpayer during the years in question in particular. The trial court pointed out that to contradict taxpayer's contentions the Government produced a number of affidavits of foreign ship owners "all of whom had repairs made by taxpayer during the fiscal years involved", including three from Norway, four from the Netherlands, seven from Italy, two from

9. Upon oral argument counsel for appellant stated that the custom was so close to universal as to amount to the same thing.

France, and three from Germany. Thus while many of the Government's affiants were owners of ships which had been repaired by taxpayer during the years in question, none of taxpayer's affiants or deponents indicated whether the firm they represented had any ships repaired by taxpayer. Taxpayer's evidence was not aimed specifically at proving that the foreign owners of ships repaired by it during the years involved actually knew of, or consented to, the payments it made to the officers of their ships. It was aimed rather at proving the existence of a long standing universal custom that such payments be made and that ship owners had knowledge of this custom in general but not in its specific application to them. On the other hand, the Government's affiants swore that although their ships had been repaired by taxpayer during the years in question they had no knowledge that taxpayer had made payments to the officers of their ships, or that their bills had been padded, and that they would not have consented to it. They generally were not aware of any such long-time or so-called universal custom and had no knowledge of taxpayer's practice in this regard; one who had heard of "isolated incidents" looked upon such practices as "thoroughly unethical"; another said such "goings-on" were "strongly forbidden by all the companies I know"; another said his company requires its captains to sign a pledge that they will not accept kickbacks; another said his company has a regulation which expressly forbids employees from accepting kickbacks with the threat that "severe action" will be taken if the regulation is violated; another said his company has offered to pay to captains a bonus equal to twice the amount of any kickback remitted to the company; and another said "in my opinion no German shipping firm would authorize such dishonest practices. From my experience I wish to state that all other shipping firms in Northern Europe are of the same opinion."

Upon the evidence the trial court found as a fact: "It cannot be said that plaintiff has clearly established by a preponderance of the evidence that the practice is universal or known to the owners of the ships repaired by it; there is ample evidence to the contrary * * *. The evidence shows to our satisfaction that foreign ship owners actually doing business with taxpayer were not aware of the 10% kickback nor of the padding of their bills by taxpayer in order to achieve this result."

As it must, taxpayer attacks this finding head on, its first specification of error being that the District Court clearly erred in finding that the evidence fails to establish knowledge of the payments on the part of the ship owners. We do not agree. Taxpayer's sole reliance for proof of knowledge was upon the alleged custom and its claimed universality. We think the evidence amply sustained the finding that the custom was not universal, was not known to the owners of the ships repaired, and that said ship owners were not aware of the kickbacks nor of the padding of their bills.

Taxpayer contends next that under the Louisiana statute defining a crime as the making of a payment "without the knowledge and consent" of the employer, the crime is committed only if the payment is made "without the knowledge and without the consent" of the employer, citing Fowler, A Dictionary of Modern English Usage 408 (under O R 4) (1937). Here again we cannot agree. We think this would be a strained construction. We think the legislature of Louisiana intended to outlaw such payments unless they were accompanied by both the knowledge and the consent of the employer. Moreover, in this case the evidence fails to show consent just as it fails to show knowledge. Indeed, it would be difficult to show consent without showing knowledge, and where, as here, the sole reliance for proof of both knowledge and consent is an alleged universal custom known to the owners, and the proof fails to establish that the custom

is universal or that it is known to the owners, then proof of knowledge fails and proof of consent also fails.

■ No contention has been advanced that the payments were not made "to influence such agent's, employee's, or fiduciary's action in relation to the principal's or employer's affairs." The record is replete with evidence that if taxpayer made no payments it would get no work. The trial court's finding is dispositive of this facet of the case: "The transaction is clearly prohibited by the Louisiana Commercial Bribery Statute and we cannot give our sanction to it."

With the facts thus established we come to the final and broader question embraced in taxpayer's sole remaining specification of error: Regardless of knowledge of the payments by the ship owners, the District Court erred as a matter of law, in holding that the payments are nondeductible. This is another way of contending that regardless of the fact that the payments are clearly violative of the Louisiana Commercial Bribery Statute and of Louisiana's public policy as defined and expressed by said statute and by the decisions of its highest courts, said payments are nonetheless deductible as ordinary and necessary business expenses.

■■ The Supreme Court has given thought to this question. "But the problem is not solved when the payments are characterized as necessary * * *. There is need to determine whether they are both necessary and ordinary." Welch v. Helvering, 290 U.S. 111, 113, 54 S.Ct. 8, 9, 78 L.Ed. 212, 214 (1933). Then too, "allowance of deductions from gross income does not turn on general equitable considerations. It 'depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed.'" Deputy v. Du Pont, 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416, 421 (1939). Moreover, allowance or disallowance depends upon the "special facts" of each case. Deputy v. Du Pont, supra, at page 496, 60 S.Ct. at pages 367–368, 84 L.Ed. 416.

This is true also and perhaps particularly in cases akin to the one at bar involving claimed tax deductions, the allowance of which would have consequences which would "frustrate sharply defined national or state policies proscribing particular types of conduct." Commissioner v. Heininger, 320 U.S. 467, 473, 64 S.Ct. 249, 253, 88 L.Ed. 171, 176 (1943). In considering the special facts of each case, "there are norms of conduct that help to stabilize our judgment, and make it certain and objective", suggesting the inquiry whether the instance is "erratic", or "brought within a known type." Welch v. Helvering, supra, 290 U.S. at page 114, 54 S.Ct. at page 9, 78 L.Ed. 212. In Textile Mills Sec. Corp. v. Comr. of Int. Rev., 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249 (1941), the Court, in holding nondeductible lobbying expenses which ran afoul of a Treasury Regulation held that the Internal Revenue Service had not usurped the legislative function in carving out this special group of expenses and making them nondeductible; that the words "ordinary and necessary" are not so clear and unambiguous in their meaning and application as to leave no room for an interpretative regulation, and that there was justification for "drawing a line between legitimate business expenses and those arising from that family of contracts to which the law has given no sanction." At page 339, 62 S.Ct. at page 280, 86 L.Ed. 249. Shortly thereafter, in Commissioner v. Heininger, supra, the Court came closer to our problem and, while allowing deduction of attorneys' fees and related legal expenses incurred in unsuccessfully attempting to obtain an injunction against a fraud order issued by the Postmaster General affecting taxpayer's business, ruled as follows:

"The Bureau of Internal Revenue, the Board of Tax Appeals, and the federal courts have from time to time, however, narrowed the generally accepted meaning of the language used in § 23(a) in order that tax deduction consequences might not frustrate sharply defined nation-

al or state policies proscribing particular types of conduct. A review of the situations which have been held to belong in this category would serve no useful purpose for each case should depend upon its peculiar circumstances. A few examples will suffice to illustrate the principle involved. Where a taxpayer has violated a federal or a state statute and incurred a fine or penalty he has not been permitted a tax deduction for its payment. Similarly, one who has incurred expenses for certain types of lobbying and political pressure activities with a view to influencing federal legislation has been denied a deduction. And a taxpayer who has made payments to an influential party precinct captain in order to obtain a state printing contract has not been allowed to deduct their amount from gross income." 320 U.S. at pp. 473, 474, 64 S.Ct. at pp. 253, 254, 88 L.Ed. 176.

The Court then went further and said that "if the respondent's litigation expenses are to be denied deduction, it must be because allowance of the deduction would frustrate the sharply defined policies of 39 U.S.C.A. §§ 259 and 732 * * * which authorize the Postmaster General to issue fraud orders", and then commented that allowance of deductibility would not result in frustration of those policies, those policies being simply to protect the public from fraudulent practices committed through the use of the mails and not to deter persons accused of violating their terms from employing counsel to assist in presenting a bona fide defense. And coming even closer to our question, the Court, in Lilly v. Commissioner of Int. Rev., 343 U.S. 90, 72 S.Ct. 497, 96 L. Ed. 769, while allowing deduction of payments made by opticians to physicians of ⅓ of sales price of glasses sold to their patients did so upon the ground that at the time and place in question the payments under consideration did "not fall in that class" of expenses which would "frustrate sharply defined national or state policies proscribing particular types

of conduct", saying that "the policies frustrated must be national or state policies evidenced by some governmental declaration of them. In 1943 and 1944 there were no such declared public policies proscribing the payments which were made by petitioners to the doctors." At pp. 96, 97, 72 S.Ct. at pp. 500, 501, 96 L. Ed. 769. The Court said further, "we do not have before us the issue that would be presented by expenditures which themselves violated a federal or state law or were incidental to such violations. In such a case it could be argued that the outlawed expenditures, by virtue of their illegality, were not 'ordinary and necessary' business expenses within the meaning of § 23(a) (1) (A)." At p. 94, 72 S. Ct. at p. 499, 96 L.Ed. 769. Lilly indicates right plainly that with the enactment of laws by North Carolina outlawing the practice the deduction would no longer be allowable, saying, "we recognize the province of legislatures to translate progressive standards of professional conduct into law and we note that legislation has been passed in recent years in North Carolina and other states outlawing the practice here considered * * *. A resulting abolition of the practice will reflect itself in the tax returns of the parties without the retroactive hardship complained of here." At pp. 97, 98, 72 S. Ct. at p. 501, 96 L.Ed. 769. And coming even closer to our case, and as if to lay the matter at rest, the Court, in Tank Truck Rentals v. Commissioner, 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958), in disallowing deduction of fines imposed upon drivers of a trucking corporation for violations of a state statute prescribing maximum truck weights said, "a finding of 'necessity' cannot be made, however, if allowance of the deduction would frustrate sharply defined national or state policies proscribing particular types of conduct, evidenced by some governmental declaration thereof" and continued "although each case must turn on its own facts * * * the test of nondeductibility always is the severity and immediacy of the frustration resulting from allowance of the deduction.

The flexibility of such a standard is necessary if we are to accommodate both the congressional intent to tax only net income, and the presumption against congressional intent to encourage violation of declared public policy.

"Certainly the frustration of state policy is most complete and direct when the expenditure for which deduction is sought is itself prohibited by statute * * *. If the expenditure is not itself an illegal act, but rather the payment of a penalty imposed by the State because of such an act, as in the present case, the frustration attendant upon deduction would be only slightly less remote, and would clearly fall within the line of disallowance. Deduction of fines and penalties uniformly has been held to frustrate state policy in severe and direct fashion by reducing the 'sting' of the penalty prescribed by the state legislature." At pp. 33–36, 78 S.Ct. at pp. 509–511, 2 L.Ed. 2d 566, 567. Under the Tank Truck holding it seems obvious that since a penalty payment although not directly prohibited by statute is nondeductible under the frustration rule because its attendant frustration is "only slightly less remote" than that to be expected from allowance of an expense which "is itself prohibited by statute", then a fortiori the outlawed expenditure itself must be disallowed because "certainly the frustration of state policy is most complete and direct when the expenditure for which deduction is sought is itself prohibited by statute." [10]

Taxpayer's reliance upon the "ship chandler" cases, Richardson v. Commissioner, decided June 28, 1957, 26 P–H Tax Ct.Mem. 439, 16 CCH Tax Ct.Mem. 518 (1957), rev'd in part, 264 F.2d 400 (4th Cir., 1959); Fiambolis v. United States, 152 F.Supp. 10 (E.D.S.C.1957); and Valetti v. Commissioner, 28 P–H Tax Ct.Mem. 692 (1957), aff'd in part and rev'd in part, 260 F.2d 185 (3d Cir., 1958), is misplaced. In Richardson there was a finding of fact that the foreign ship owners and their local agents were "aware of this practice"; in Fiambolis there was a finding of fact that the owners of the ships "not only knew about the practice of their captains and masters receiving discounts, but actually approved of it"; and in Valetti there was a finding of fact that "the owners of the ships knew such commissions were being paid." In the case at bar the fact findings are the other way.

Taxpayer seeks comfort also in Commissioner v. Sullivan, 356 U.S. 27, 78 S. Ct. 512, 2 L.Ed.2d 559 (1958). We should hardly expect to find irreconcilability between Sullivan on the one hand, and Tank Truck Rentals and its companion case, Hoover Motor Express Co. v. United States, 356 U.S. 38, 78 S.Ct. 511, 2 L.Ed.2d 568 (1958), on the other. These three are companion cases considered and decided together on the same day, each by the same unanimous Court. No conflict was discerned there. In Sullivan the issue was the deductibility of rent and wages paid in the operation of an illegal gambling enterprise. The Tax Court had considered the problem in three cases arising under the statutes of

10. The following reasons have been suggested for the limited number of direct holdings of nondeductibility of commercial bribery payments, and other illegal expenditures:

"Commercial Bribery and Similar Payments.—The number of cases presenting the issue of commercial bribery has been indirectly limited by the Commissioner's policy that before a taxpayer may deduct payments for personal services, he must furnish the Commissioner with the name, address and amount paid to each recipient. But where the question has been presented, the courts have usually justified the disallowance on the ground that such expenditures are not 'ordinary,' or that, in any event, they are not 'necessary'." Note, Deductions of Business Expenses: Illegality and Public Policy, 54 Harv.L.Rev. 852, 857 (1941).

"Where the expenditure itself is in violation of a statute, it would presumably be a rare case in which a court would be willing to call the expenditure 'ordinary and necessary' in itself, so that a choice between the conflicting policies of allowing deduction for ordinary and necessary expense but disallowing deduction for expenses 'contrary to public policy' would hardly arise." Surrey and Warren, Federal Income Taxation, Cases and Materials, 243 (1960).

Illinois. The statutes relied upon by the Commissioner in these cases are Illinois Revised Statutes, ch. 38 (Criminal Code), §§ 139, 140, 336, and 582. Sections 139 and 140 are general conspiracy statutes. Section 336 makes the conduct of a bookmaking establishment illegal and provides also that any person who records or registers wagers shall be punishable. Section 582 is a general aiding and abetting statute. In Commissioner v. Doyle, 23 P–H Tax Ct.Mem. 1067 (1954), aff'd, 231 F.2d 635 (7th Cir., 1956), the Commissioner contended that amounts paid for wages and rent in the conduct of such establishments were nondeductible as they "would frustrate the laws of Illinois which prohibit bookmaking". The Tax Court decided in favor of deductibility. The Court of Appeals for the Seventh Circuit in affirming the Tax Court's decision held that whether the expenditures be "lawful or unlawful" they were deductible because they were "an integral part of a business," adding "integrality is the test." In Mesi v. Commissioner, 25 T.C. 513 (1955), rev'd, 242 F.2d 558 (7th Cir., 1957), aff'd, Commissioner v. Sullivan, 356 U.S. 27, 78 S.Ct. 512, 2 L.Ed.2d 559 (1958), the Tax Court held that wages paid by one who conducted an illegal bookmaking business were nondeductible saying that under §§ 336 and 582 "the payment of the wages in question in and of itself constituted an illegal act. The wages paid by petitioner were paid to procure the direct aid of others in the perpetration of an illegal act, namely, the operation of a bookmaking establishment." In Ross v. Commissioner and Sullivan v. Commissioner, 25 P–H Tax Ct. Mem. (1956), rev'd, 241 F.2d 46 (7th Cir., 1957), aff'd, 356 U.S. 27, 78 S.Ct. 512, 2 L.Ed.2d 599 (1958), the Tax Court extended its wages ruling in Mesi to

wages and rent saying "we think that the principles there [in Mesi] announced are equally applicable to rental payments on the facts presented in the instant case. It is clear that the lessor as well as the lessees was fully aware that an illegal bookmaking enterprise was being carried on upon the premises, and that both the payment and receipt of rentals were in violation of sections 336 and 582 of the Illinois Revised Statutes." At pp. 23, 24. The decisions of the Tax Court in Mesi, Ross, and Sullivan were reversed by the Court of Appeals for the Seventh Circuit under the integrality test of Doyle. When Mesi, Ross, and Sullivan reached the Supreme Court Mr. Justice Douglas for the Court pointed to the Federal Government's recognition of gambling as a business enterprise for Federal tax purposes and to the regulations [11] which make the Federal excise tax on wagers deductible as an ordinary and necessary business expense, concluding that "the policy that allows as a deduction the tax paid to conduct the business seems sufficiently hospitable to allow the normal deductions of the rent and wages necessary to operate it." At p. 29. If in Illinois a gambler's payment of wages and rent constitutes a criminal act it is so because of the general provisions of § 336 making the conduct of a bookmaking establishment illegal or because of the general provisions of the aiding and abetting statute. There is no specific statute or language making it a crime for a gambler to pay his wages or his rent. There is not in that area therefore the same specificity of proscription which marks the Louisiana statute's treatment of commercial bribery. The state policy in the one instance is not as "sharply defined" as in the other.[12] One writer has said that Sullivan simply holds that expenses

---

11. Treas.Reg. 118, § 39.23(a)–1, Rev.Rul. 54–219, 1954–1 Cum.Bull. 51.

12. In addition to the pointedness of the statute the court below discerned other expressions of this policy in the jurisprudence of Louisiana, observing: "Padding the repair bill to take care of the amount of the payments, and thereby to make the ship owner himself pay for the

kickback, without his knowledge or consent, is a species of fraud also forbidden by Louisiana Criminal Statute. See La. R.S. Title 14.67", and that "the Louisiana judicial decisions likewise indicate the illegal nature of the transactions involved here and the impropriety of the crew accepting gratuities without the specific knowledge or consent of their principals,

which are clearly deductible by a legitimate business are also deductible by an illegitimate business.[13]

The decisions of this court in Alexandria Gravel Co. v. Commissioner of Internal Revenue, 95 F.2d 615 (5 Cir., 1938), and Commissioner of Internal Revenue v. Longhorn Portland Cement Co., 148 F.2d 276 (5 Cir., 1945), tend 'rongly to foreshadow our present holding.

The judgment of the trial court was right, and is

Affirmed.

the ship owners." Citing Foreman v. Pelican Stores, 21 So.2d 64 (Ct.App.La. 1944).

13. Roehner on Federal Taxation, Vol. 8, Number 5, January 11, 1963:

"When the Supreme Court decided Sullivan, Tank Truck Rentals, and Hoover Motor Express Co., all in 356 U.S. (1958), we found no conflict between Sullivan and the two others.

"In Sullivan, the Court held that payments for salaries and rent were deductible by a bookmaker, although against State law. In the other two cases, the Court held that fines paid by trucking companies to the State for weight violations were not deductible.

"To us the Court was clearly correct in all three cases. Before the Court decided Sullivan, we had taken the position that expenses that were deductible by a legitimate business were deductible by an illegitimate business, which is all that Sullivan held. In the other two cases the fines were not deductible by any business."