SWED DISTRIBUTING COMPANY, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 20026.

United States Court of Appeals Fifth Circuit.

Sept. 27, 1963.

Dorothy Ann Kinney, Sterling E. Kinney, Amarillo, Tex., for petitioner.

Frederick E. Youngman, Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., John B. Jones, Jr., Acting Asst. Gen., Crane C. Hauser, Chief Counsel, John M. Morawski, Atty., I. R. S., Washington, D. C., for respondent.

Before PHILLIPS,* WISDOM, and GEWIN, Circuit Judges.

WISDOM, Circuit Judge.

This case, now before us for the second time, presents the question whether the taxpayer, Swed Distributing Company, a Florida corporation, is entitled to deduct as ordinary and necessary business expenses certain payments made to Swed and Sullivan, a partnership composed of the taxpayer's two stockholders. The nature of the case requires close scrutiny of the record.

Louis Swed and John L. Sullivan formed a partnership to go into the beer distributing business in Florida on December 30, 1944. Through one George O. Hinzpeter, the partnership was able to obtain a Florida distributorship for Budweiser beer. Swed was to run the business and receive a salary, but the profits were to be evenly divided.

* Of the Tenth Circuit, sitting by designation.

Hinzpeter was in the employ of Anheuser-Busch, the brewer of Budweiser. His immediate superior was J. J. Carroll, a vice-president and the general sales manager. The Tax Court found that during the period from 1945 through 1949 Carroll and Hinzpeter received under-the-table payments from distributors anxious to obtain beer when its was in short supply during and after World War II. On June 1, 1945, Swed and Sullivan executed a new partnership agreement in which Hinzpeter was given a thirty-five per cent interest. He was required simply to devote his time and services to the partnership and contributed no capital. It was understood, at least by Hinzpeter, that twenty per cent of his interest was to go to Carroll.

Hinzpeter's inclusion in the partnership came about solely because of Carroll's insistence. At this time and until his death in 1949, Carroll, as general manager, controlled the granting of Budweiser distributorships and the amount of beer each distributor would be permitted to obtain. Swed and Sullivan had no formal franchise from Anheuser-Busch. Hinzpeter left Anheuser-Busch on the day the partnership agreement was signed.

October 1, 1945, Swed, Sullivan, and Hinzpeter entered into an agreement dissolving their new partnership and reinstating the old partnership between Swed and Sullivan. By the terms of this agreement Hinzpeter obtained an employment contract with the partnership. Under it he was to receive a thousand dollars a month and fifteen per cent of the net profits of the business.

In July 1946 Swed and Sullivan organized a corporation to take over and carry on the business of the partnership. At that time, Swed held a sixty per cent stock interest and Sullivan forty per cent, give or take a few qualifying shares; two years later they were equal partners. At about the same time the company was incorporated, Swed and Sullivan formed a new partnership, known as "Swed and Sullivan", in which each took an equal interest. All during this period Swed was becoming more and more dissatisfied with Hinzpeter. He was afraid that Hinzpeter's ignorance of Florida law might get the company into trouble and he felt that Hinzpeter did not understand the problems involved in operating a distributorship. Finally, Swed asked Carroll to reemploy Hinzpeter at Anheuser-Busch. Thereupon, Carroll dictated the contract here in controversy. Basically, it provided that in return for cancellation of Hinzpeter's employment contract, Swed Distributing Company would pay him throughout his life fifteen per cent of the net profits as long as the company was not deprived of any of its Florida branches. These conditions were met. The Tax Court found that Carroll was responsible for the confection of this contract. Swed had no desire to give Hinzpeter this or any other contract; the alternative, however, would have meant the loss of the Budweiser distributorship. Hinzpeter went back to work for Anheuser-Busch. After October 1, 1946, Hinzpeter rendered no services for the taxpayer.

In the fall of 1947 Swed became dissatisfied, because he was not making enough money. Hinzpeter was taking fifteen per cent out of the company's net profits and Swed was making under-the-table payments of his own money to Carroll which he could not deduct from his income tax. He threatened to quit the business. Carroll was disturbed at this threatened loss of income. Consequently, when Swed indicated to him that he would continue in business, if Hinzpeter's fifteen per cent were eliminated, Carroll agreed to negotiate with Hinzpeter. As a result of Carroll's successful negotiations, Hinzpeter's wife brought the contract from California, where Hinzpeter was then working, to Carroll in St. Louis. There, for $25,000 in fifty-dollar bills, Carrol sold Swed the contract. The Tax Court found that Carroll did not give the money to Mrs. Hinzpeter. It is not clear whether Hinzpeter ever got the money at all. He denied that Carroll gave it to him.

Swed bought the contract for the partnership. To finance this arrangement he drew a sight draft for $25,000 which he deposited in the partnership's account in a Tampa, Florida, bank. Thereafter, he cashed a check drawn on that account. Since the partnership had only a small balance in that particular account, Sullivan's son-in-law, at Swed's request, covered the draft. Later, the bank paid the son-in-law back and accepted a note from Swed Distributing Company for the same amount. The company eventually paid the note, debiting its own notes payable to Swed and Sullivan. At the time of the assignment of the contract, Swed Distributing Company had several hundred thousand dollars in its bank account. The cost of Swed's transportation to St. Louis and back was billed to and paid for by the company.

The company made the following payments under the contract:

| Fiscal Year Ending July 31 | Amount | Paid to |
|---|---|---|
| 1947 | $20,852.72 | Hinzpeter |
| 1948 | 18,378.65 | Partnership |
| 1949 | 17,001.35 | Partnership |
| 1950 | 15,089.27 | Partnership |
| 1951 | 15,075.40 | Partnership |
| 1952 | 16,038.69 | Partnership |
| 1953 | 19,497.72 | Partnership |

The years in dispute are 1951, 1952, and 1953. The Commissioner disallowed petitioner's deductions for these payments as ordinary and necessary business expenses. In the first proceedings, upholding the Commissioner's determination, the Tax Court found that the taxpayer had failed to establish the assignment of the contract. 31 T.C. 84. On appeal from that decision this Court held that the evidence did not support the Tax Court's major premise that the assignment had never been made, and reversed with instructions that the Tax Court have a complete trial of all the issues in the case. 272 F.2d 330.

After a full hearing, the Tax Court found that the payments were under-the-table payments to Carroll to insure continuation of the company's distributorship and ample supplies of beer. "Hinzpeter was no more than the 'front man' for Carroll." "The death of Carroll in 1949 caused the reason and consideration for these payments to terminate and ended petitioner's obligation to pay pursuant to the contract, since the services for which the payments were being made were no longer rendered." Thereafter, the payments were "merely payments by peititioner to its shareholders not in return for any consideration, hence they were not ordinary or necessary expenses".

The 1939 Internal Revenue Code provides that "in computing net income there shall be allowed as deductions * * * All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *" Int.Rev.Code of 1939, § 23(a) (now Int.Rev.Code of 1954, § 162(a)). An expense may be necessary even though the taxpayer is under no legal obligation to pay it, if it serves to aid his trade or business. Dunn & McCarthy v. Commissioner, 2 Cir., 1943, 139 F.2d 242. It also may be ordinary even though incurred but once during the existence of the taxpayer, if it constitutes a usual measure to protect the taxpayer's line of business. Heininger v. Commissioner, 1943, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171, 7 Cir. 1943, affirming 133 F.2d 567. At the same time, the payment must be to serve the taxpayer's business and not someone else's, Deputy v. Du Pont, 1939, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416; United States v. Donaldson Realty Co., 8 Cir. 1939, 106 F.2d 509, and the fact that the taxpayer is contractually bound to make the payment does not of itself render it ordinary and necessary. Interstate Transit Lines v. Commissioner, 1943, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607; Beneficial Corp., 18 T.C. 396 (1952).

There is little doubt that payments made on a bona fide contract compromising a prior contract of employment are deductible as an ordinary and necessary business expense. Boulevard Frocks, Inc., 1 CCH Tax Ct.Mem. 358 (1943).

See Helvering v. Community Bond & Mortgage, 2 Cir., 1935, 74 F.2d 727 and Dunn & McCarthy v. Commissioner, 2 Cir.1943, 139 F.2d 242; compare Dixie Mach. Welding & Metal Works, Inc. v. United States, 5 Cir., 1963, 315 F.2d 439, cert. den'd, 373 U.S. 950, 83 S.Ct. 1679, 10 L.Ed.2d 705.

■ Assuming the assignability of the contract, the taxpayer argues that its assignment to a third party should not affect the deductibility of the payments made under it. But this contract was assigned to a partnership consisting of the sole stockholders of the petitioner. The vast bulk of the payments under the contract and all of those in question were made to the partnership. Such disbursements should be given the closest scrutiny. See W. H. Armston Co. v. Commissioner, 5 Cir., 1951, 188 F.2d 531. Petitioner cites several cases in support of its contention that it is the origin of the liability out of which the expense accrues which is material. See, e. g., Deputy v. Du Pont; Commissioner v. Bagley & Sewall Co., 2 Cir., 1955, 221 F.2d 944. In all these cases the origin of the liability, by contract or otherwise, was viewed simply to determine the realities of the case. The origin, of itself, was not decisive of the tax consequences during the taxable years. Here the taxpayer was obliged to make payments in compromise of an employment contract where neither the former employee nor a third party were in a position to complain about nonpayment. Cf. Darco Realty Corp. v. Commissioner, 4 Cir. 1962, 301 F.2d 190. Swed and Sullivan were the only ones who were able to enforce the contract and, if they had cancelled it for, or sold it to, the corporation and declared a substantial dividend the same economic result would have obtained as here. Compare Ballenger v. United States, 4 Cir. 1962, 301 F.2d 192 (redemption of preferred stock by sole stockholder equivalent to a dividend). The $25,000 Swed and Sullivan paid for the contract had been returned handsomely by payments before the taxable years in question. The situation at the time of the 1951–1953 payments, therefore, becomes clear as day. The company, owned fifty-fifty by Swed and Sullivan, paid Swed and Sullivan, partners, fifteen per cent of its net profits a year. All of these circumstances taken together render these payments a distribution of profits. See Lengsfield v. Commissioner, 5 Cir., 1957, 241 F.2d 508. They cannot be deemed expenses of carrying on the taxpayer's business. See Paramount-Richards Theatres v. Commissioner, 5 Cir., 1946, 153 F.2d 602; compare Capital Indem. Insur. Co. v. Commissioner, 7 Cir., 1956, 237 F.2d 901.

We are aware that we have parted company along the way with the Tax Court. That court lumped together all of the payments, those pursuant to the contract and those under the table directly to Carroll. According to its theory, the contract with Hinzpeter was a sham and the only "real" contract was one with Carroll not to take away the distributorship and to keep petitioner well supplied with beer. After Carroll's death, there was no more contract. Any payments, therefore, purportedly made under the contract with Hinzpeter were without consideration and amounted to a distribution of profits. W. D. Haden Co., 37 T.C. 512 (1961). However, there were some genuine elements to the contract, at least as to the Hinzpeter dealings. He worked for the petitioner's predecessor partnership and then for the petitioner for some months. He was instrumental in obtaining the distributorship for Swed and Sullivan. Swed could not just neglect him when he had a lucrative employment contract with petitioner. In spite of Carroll's domination throughout this entire transaction, Hinzpeter was a genuine article to some extent. In short, were Carroll dead and Hinzpeter still the own- of the contract and being paid pursuant to it, we might—just might—allow the deduction.

Distinguishing the payments from the direct payoffs to Carroll avoids the question whether these payments were legitimate "kickbacks" and hence deductible, Lilly v. Commissioner, 1951, 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769, or contra-

vened some clearly defined public policy, Cohen v. Commissioner, 10 Cir., 1949, 176 F.2d 394. Dixie Machine Welding & Metal Works, Inc. v. United States, 5 Cir., 1963, 315 F.2d 439. The payment to Hinzpeter under the contract was, as we have found, a necessary one as part of the deal to get out of the employment contract. Therefore, characterization of the payments to Carroll is unnecessary.

The taxpayer advances as a supporting argument that the assignment of the contract itself served an ordinary and necessary business purpose in that it preserved the corporate life of the taxpayer by retaining Swed in the business. This may have been a good investment on the part of the partnership, but it did not convert all subsequent payments to the partnership into "ordinary and necessary" expenses of the corporation. See Schalk Chem. Co. v. Commissioner, 9 Cir., 1962, 304 F.2d 48; Illinois Agricultural Holding Co. v. Commissioner, 7 Cir., 1942, 131 F.2d 583. Otherwise, any distribution of profits to key shareholder-officers would be an ordinary and necessary business expense.

The taxpayer contends that the Commissioner, in disregard of the corporate fiction, is attempting to obtain a decision that corporations may not deduct expenses arising from obligations owned by their stockholders. That is not this case. As a matter of contract law, the obligations of the corporation under the contract, assuming the contract was assignable, may have been identical before and after the assignment. But as a matter of tax law, it is a different story. The tax consequences incident to the contract must be viewed as of the years in issue. The payments may have been ordinary and necessary business expenses at the inception of the contract, because they enabled the company to stay alive. When the necessity ceased to exist, the payments changed their character. To stay alive and to keep the beer flowing, it was not necessary for Swed Distributing Company to pay Swed and Sullivan. After the assignment, the contract was just

a device for the corporation to distribute earnings to its two stockholders hopeful of avoiding taxes. The taxpayer would have us approach this problem from the wrong side. It is not the receipt of the payments we must scrutinize; it is the expense to the taxpayer.

The judgment is affirmed.