OPINION Imputation of Interest Income Under Section 4-8B Each, petitioner owns and operates a department store in downtown Rochester, N.Y. In 1958, petitioners organized Midtown Holdings Gorp. as a vehicle for constructing and operating an enclosed-mall shopping center abutting upon their department stores. It was hoped that the shopping center would not only revitalize their business, but also enhance the value of their real estate investment. The project (known as Midtown Plaza) turned out to be far more expensive than expected. In consequence, petitioners from time to time made various loans to Midtown. As our findings of fact show, no interest was paid on these loans. With respect to $1 million of such loans, originally made in equal amounts in September 1960 and renewed in September 1963 and again in September 1966, respondent lias imputed interest income at 5 percent per annum to each petitioner. In so doing, respondent has relied on section 482[2] and the regulations issued thereunder. See sec. 1.482-2(a), Income Tax Regs. At all relevant times Forman’s and McCurdy’s were the sole shareholders of Midtown, each owning 50 percent of its issued and outstanding stock. Members of the Forman family controlled Forman’s and members of the McCurdy family controlled McCurdy’s. There is not the slightest suggestion in the record that any members of the Mc-Curdy family and the Forman family were in any way related and respondent has made no contention in this respect. Section 482 grants respondent authority to allocate income, deductions, credits, and allowances among two or more “organizations, trades or businesses * ⅜ * owned or controlled directly or indirectly by the same interests.” This means actual, practical control rather than any particular percentage of stock ownership. South Texas Rice Warehouse Co. v. Commissioner, 366 F. 2d 890, 894—896 (C.A. 5, 1966), affirming 43 T.C. 540, 561-562 (1965); Jesse E. Hall, Sr., 32 T.C. 390, 409-410 (1959), affd. 294 F. 2d 82 (C.A. 5, 1961); sec. 1.482-1 (a) (3), Income Tax Regs. Respondent contends, and petitioners deny, tliat the requisite control existed. We agree with petitioners. Each petitioner had only a 50-percent interest in Midtown, but this, standing alone, would not enable it to dominate or manipulate Midtown. With the possible exception of forcing a dissolution (see N.Y. Bus. Corp. Law, sec. 1104 (McKinney 1963)), the best that either petitioner acting alone could achieve was a deadlock. There was no relationship between the shareholders of petitioners which could form the basis for finding that any group of shareholders could be said to have control of both Forman’s and McCurdy’s and, thus, control of Midtown as well. It was just such a relationship which supported a finding of control in Advance Machinery Exch. v. Commissioner, 196 F. 2d 1006 (C.A. 2, 1952), affirming a Memorandum Opinion of this Court, Grenada Industries, Inc., 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), and Jesse E. Hall, Sr., supra, heavily relied upon' by respondent. In Advance Machinery and Hall, the necessary relationship rested on family solidarity, and in Granada Industries, it stemmed from a proportional common ownership of the entities involved. These cases are consequently clearly distinguishable. In short, there was no ownership or control (in the usual sense of those terms) of “two or more organizations, trades or businesses.” (Emphasis added.) Respondent does not seriously contest this conclusion. Rather, he argues that the requirements of section 482 are met because Forman’s and McCurdy’s had a common interest as far as their department store businesses were concerned which dictated that they act in concert with respect to Midtown. In urging this expansive interpretation of section 482, respondent recognizes that our holding in Lake Erie & Pittsburg Railway Co., 5 T.C. 558 (1945), is directly contrary to his position. He urges us to overrule our prior decisions and articulates on brief the analysis set forth in Rev. Rul. 65-142, 1965-1 C.B. 223. In essence, this analysis is premised on the assertion that, in organizing and operating Midtown, Forman’s and McCurdy’s should be considered as acting as a partnership and that there is, therefore, the requisite control of two entities, namely, the partnership and Midtown. We have carefully reexamined our decision in Lake Erie & Pittsburg Railway Co., supra, and have concluded that it should be reaffirmed. The clear language of section 482 requires that there be two business entities with respect to which direct or indirect control by the same interests can be found. If we look at Midtown and Forman’s or Midtown and McCurdy’s, no such control existed. To import a common objectwe test into section 482, and thereby create a theoretical partnership between Forman’s and McCurdy’s, would require an unwarranted elasticized reading of the statutory language. Perhaps the absence of an obligation to pay interest on the loans produced a distortion of income as between Midtown and petitioners, but we find nothing in the legislative history which would justify the interpretation of the phrase “same interests” urged by respondent. Congress clearly had in mind a finding of ownership or control of two or more businesses by the same interests. See H. Rept. No. 2, 70th Cong., 1st Sess., pp. 16-17 (1927).[3] See also Fred J. Sperapani, 42 T.C. 308, 336 fn. 6. The hard fact is that Congress did not design section 482 to cover every potential distortion of income and deduction. To refer to Mc-Curdy’s shareholders and Forman’s shareholders as “the same in-trests” would be a distortion, not of income, but of words. We are reinforced in our conclusion by the fact that respondent acquiesced in our decision in Lake Erie & Pittsburg Railway Co., supra., for 20 years. See 1945 C.B. 5; acquiescence withdrawn 1965-1 C.B. 5; Rev. Rul. 65-142, supra. Such long-standing administrative interpretation of statutory language may properly be taken into account. See Hanover Bank v. Commissioner, 369 U.S. 672, 686 (1962). In view of our conclusion that the requisite control under section 482 did not exist, we do not decide whether this case would fall within the ambit of those decisions dealing with the question of the extent to which that section authorizes the allocation of income where no income is realized. See, e.g., Smith-Bridgman & Co., 16 T.C. 287, 293 (1951). Nor need we consider the impact on section 482 of the specific provisions of section 483 dealing with imputed interest in certain situations. Compare also J. Simpson Dean, 35 T.C. 1083, 1087-1090 (1961). Deductibility of Kiosk Prevention Payments During each of the years in question, each petitioner paid Midtown $75,000 to keep kiosks off the North Mall and deducted the payments as ordinary and necessary business expenses. Respondent has disallowed the deductions. Whether or not a payment constitutes an ordinary and necessary business expense constitutes primarily a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). See Welch v. Helvering, 290 U.S. 111, 115 (1933). Clearly, there is no automatic barrier to resolving that question in favor of a taxpayer even though the payor and payee are in a corporation-shareholder relationship. Compare Ray's Clothes, Inc., 22 T.C. 1332 (1954). But where such a relationship exists, the payment should be subjected to close scrutiny to ensure that it is indeed what it purports to be. E.g., Darco Realty Corporation v. Commissioner, 301 F. 2d 190 (C.A. 2, 1962). A pair of escalators and a causeway divided the shopping mall of Midtown Plaza into two unequal parts. The South Mall, the smaller of the two, had kiosks in it, tenanted by various commercial enterprises. The North Mall, which had petitioners’ department stores along two of its sides, was kept clear of kiosks so that it could be used for noncommercial events. In effect, the North Mall functioned as a sort of community center. The various events held there drew people to Midtown Plaza who would not otherwise come. This extra traffic was of value to Midtown, to petitioners’ department stores, and to all the commercial tenants of Midtown Plaza. Even more important is the quite considerable publicity generated by these events; this publicity served as a very effective form of institutional advertising. Petitioners posit their assertion of deductibility on the ground that the payments served an advertising function, since they made possible the use of the North Mall for promotional events from which they directly benefited. They further seek to support their claim by arguing that they, in effect, rented the North Mall from Midtown and that, since $150,000 constituted a reasonable rental, commensurate with what an independent lessee would pay, it follows that that amount was paid exclusively for the use of the Mall and is therefore deductible. Compare Polak's Frutal Works, Inc. v. United States, 176 F. Supp. 521 (S.D.N.Y. 1959), affd. 281 F. 2d 261 (C.A. 2, 1960). We have no quarrel with petitioners’ arguments as far as they go. The difficulty is that they are not determinative of the question before us. Use of the North Mall as a sort of community center doubtless benefited the petitioners, but equally beyond doubt is the benefit to Midtown Plaza as a whole. Midtown stood to benefit immediately to the extent that it would share in the increased business through percentage leases. And beyond this immediate benefit, the attractiveness of Midtown Plaza to business tenants was increased, thereby enhancing the ability of Midtown to obtain higher rentals in the future. These factors made it in the interest of Midtown to keep the North Mall free of kiosks. Concededly, landlords of shopping centers may normally want to rent out kiosks in order to obtain additional rentals. But Midtown was not faced with, a simple choice between kiosks and no kiosks; it had to choose between kiosks and an extremely effective form of institutional advertising. In short, Midtown was faced with a choice as to what was in its own best independent interests. In our opinion, as our findings of fact show, it made that choice no later than April 10, 1962, the date on which Midtown Plaza opened and long before the contractual obligation to pay the $150,000 was undertaken by petitioners. As we see it, the test is whether the arrangements calling for the payment of the $150,000 were in fact what they purported to be, namely, an annual expenditure for a current benefit to petitioners which Midtown had to be induced to confer. Clearly, the mere fact that petitioners were legally bound to make the payment is not determinative. See, e.g., Atlantic Monthly Co., 5 T.C. 1025, 1032 (1945). The question is: Should petitioners be allowed a deduction as an ordinary and necessary business expense for recurring payments for a promise by the payee not to undertake an activity which it had already decided not to undertake in its own independent interests ? While we have found no decision which furnishes us with direct guidance, we conclude that the question should be answered in the negative. Cf. Swed Distributing Co. v. Commissioner, 323 F. 2d 480 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court, on remand from 272 F. 2d 330 (C.A. 5, 1959), which, in turn, had reversed 31 T.C. 84 (1958) ; Ingle Coal Corporation v. Commissioner, 174 F. 2d 569 (C.A. 7, 1949), affirming 10 T.C. 1199 (1948); Ray's Clothes, Inc., supra; Granberg Equipment, Inc., 11 T.C. 704 (1948).[4] Our conclusion that the arrangements were not what they purport to be is further reinforced by several additional elements present herein: (1) The fact that petitioners’ payments to Midtown were equal is highly suggestive. Petitioners’ sales volumes and income differed markedly. The effect upon the revenue of their department stores of the North Mall activities would almost certainly be different. If the decision to keep kiosks off the North Mall had been made in connection with the department store businesses of petitioners, it would seem that the petitioner who could expect to reap a lesser benefit from the advertising would have demanded that payment be proportional to its expected benefit. Moreover, we note that none of Midtown’s tenants were asked to make such payments, although they benefited from the promotional events. Finally, the original agreement between petitioners required that their investment be equal. Thus, the equality of payments suggests that they were intended as capital contributions. (2) There were good reasons for artificially inflating Midtown’s income at the expense of the department store businesses. Midtown needed cash; petitioners therefore had to make capital contributions or loans to Midtown. Petitioners had substantial taxable income against which deductions could 'be used, Midtown had substantial tax losses to soak up increases in income, and Chiarella’s bonus would be increased 'by increased rental income. To the extent that a capital contribution could be disguised as income to Midtown and business expense to the petitioners, everybody benefited and no one was hurt significantly. While tax avoidance may be a permissible objective where the substance and form of the transaction coincide, the presence of a pattern of tax benefits certainly constitutes a yellow caution signal on our road to decision. Cf. George L. Schultz, 50 T.C. 688, 694 (1968), affirmed per curiam 420 F. 2d 490 (C.A. 3, 1970). We again emphasize that we are not dealing with a situation where the payment in question is for a benefit conferred which the payor was concerned it might lose through bona fide action by the payee. Under such circumstances, the measurement of the value of the payments against the benefit conferred in order to support the contention of a quasi rental,[5] or the justification of the payments as an advertising expenditure, or the possibility of interference by the kiosks with the visibility of petitioners’ store windows, or'whether the petitioners were under obligation to Chiarella to maximize the income of Midtown in order to enhance his bonus would have been highly relevant. But in the posture of this particular case, those considerations are totally beside the point. We conclude that the payments of $75,000 by each of the petitioners to Midtown were disguised capital contributions and therefore not deductible expenses. In order to reflect certain adjustments made in the notices of deficiency and not contested in the petitions, as well as our resolution of the first issue, Decisions will he entered under Bule 50. Reviewed by the Court. SBC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in, order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In enacting the 1954 Code, Congress explicitly stated it was malting no substantive changes in; sec. 482. See H. Rept. No. 1337, 83d Cong., 2d Sess., p. A165 (1954) ; S. Rept. No. 1622, 83d Cong., 2d Sess., p. 310 (1954). Compare also Max J. Epstein, T.C. Memo. 1964-192. In this connection, we note that, under the agreement of Nov. 6, 1964, Midtown was to “retain complete control, direction and management” of the North MaU. And when charges were made for the use of North MaU space, Midtown, not petitioners, received the money.